STATE, *ex rel.* COLLEGE OF BISHOPS OF M. E. CHURCH, SOUTH, *et al. v.* BOARD OF TRUST OF VANDERBILT UNIVERSITY *et al.*

(*Nashville.* December Term, 1913.)

1. **COLLEGES AND UNIVERSITIES.** Governing boards and officers.

The action of the board of trust of a denominational university in adopting resolutions accepting a report of a commission appointed by a general conference to inquire into the relations of the university to the denomination, recognizing the ownership of the church in the university and welcoming any supervision by the college of bishops, so as to insure observance of the charter, etc., was not an acceptance of the commission's conclusion that since 1898 the general conference, as assignee of the annual conferences is the sole member of the corporation, that the university was founded by the annual conferences, and not by an individual donor, and that the college of bishops had no other rights or powers than that of common-law visitation. (*Post, pp.* 322-324.)

2. **CORPORATIONS.** Incorporation and organization. Statutes.

Acts 1871, ch. 54, secs. 1, 9, passed in pursuance of Const. 1870, forbidding charters by special act, providing by section 1 that persons desiring to be incorporated shall file a petition in the chancery court of the county in which the largest number of them reside, setting forth the purposes of the corporation, prescribing publication of the petition, and directing an *ex parte* hearing thereof, and a decree or charter enumerating such usual powers of corporations as might be necessary to carry out the corporate objects, and by section 9 providing that the court may incorporate educational, religious, and charitable institutions with powers and privileges as prescribed in Code 1858, secs. 1470-1473, was a general act covering the whole

subject and superseding the Code provisions, except so far as they were adopted thereby, and as to institutions of learning expressly gave the same powers as enjoyed by like corporations under the Code. (*Post, pp.* 324-326.)

Acts cited and construed:   Acts 1870-71, ch. 54.

Code cited and construed:   Secs. 1471-2-3 (M. & V. and 1858).

Cases cited and approved.   Terrell v. State, 86 Tenn., 523; Malone v. Williams, 118 Tenn., 445; Heck v. McEwen, 80 Tenn., 97; *ex parte* Chadwell, 62 Tenn., 98.

3. CORPORATIONS.   Incorporators.   Conferences.

Acts 1871, ch. 54, requiring incorporators to file a petition in the chancery court, which, after publication and *ex parte* hearing, shall by decree or charter enumerate the usual powers of corporations necessary to carry out the corporate objects, and which extends the power of the court to incorporation of institutions of learning, etc., contemplated the incorporation of actual persons and not of corporations or voluntary associations, so that conferences composed of delegates from the several churches within their limits were not competent to associate with each other for incorporation, or without express statutory authority to act as members of a corporation, nor were the delegates to such conferences competent to act as incorporations. (*Post, pp.* 326-328.)

Cases cited and approved:   Mallory v. Oil Works, 86 Tenn., 598; Rhodes v. Rhodes, 88 Tenn., 637; Green v. Allen, 24 Tenn., 170.

4. COLLEGES AND UNIVERSITIES.   Incorporations and organizations.   Ratification.

Where the action of a religious convention did not intend to incorporate any but individuals composing the board of trust thereby appointed, and where a by-law adopted in furtherance of the convention's action, declared that the charter should leave "the perpetuity of the board in its own power," and requested the several co-operating conferences to nominate four members for election thereto, which by-law was certified, to-

State, ex rel. v. Vanderbilt University.

gether with the charter obtained by such trustees, to the con-
ferences, their ratification of such action, even if they under-
stood that they thereby became incorporators, could not change
the legal effect of the charter, which made the trustees the
incorporators.   (*Post, pp.* 328, 329.)

5. **COLLEGES AND UNIVERSITIES.** Petition for incorporation,
Incorporators.

The petition to the chancery court for incorporation is the basis
and measure of the charter, and while the court may grant less,
it may not grant more, than is sought by the petition; and hence
the petition for a charter for a denominational university, filed
by the designated board of trustees as individuals and not as
representatives, made them and no others the incorporators,
with the right of perpetual succession; the fact that they were
described in the charter as representatives of certain annual
conferences being immaterial.   (*Post, pp.* 328, 329.)

6. **CORPORATIONS.** Incorporation by chancery court. Minister-
ial Act.

The chancery court, in granting a decree or charter under Acts
1871, ch. 54, though acting according to judicial forms, acted
ministerially, and could not depart in substance from the pe-
tition.   (*Post, pp.* 328, 329.)

Cases cited and approved:   Wilson v. Schaefer, 107 Tenn., 300:
Gilreath v. Gilliland, 95 Tenn., 383.

7. **CORPORATIONS.** Charter. Incorporators. Choice of Suc-
cessors.

Where neither the general incorporation act nor the charter it-
self provided how successors to the individual incorporators
should be chosen, such right in the case of a corporation ag-
gregate, by necessary implication, vested in the persons so in-
corporated.   (*Post, p.* 329.)

8. **CONTRACTS.** Construction. Practical interpretation.

The practical interpretation of a contract by the parties thereto
is intitled to great, if not to controlling, influence.   (*Post, p.*
329.)

9. **COLLEGES AND UNIVERSITIES.** Incorporation. Charter.

Under the general incorporation act (Acts 1871, ch. 54), requiring that the petition to the chancery court set forth the objects of the corporation, it was proper for the court, upon petition for incorporation "for the purpose of soliciting subscriptions and donations for the erection and maintenance of an institution of learning of the highest order, . . . together with the rights, powers, and privileges which, by law, may belong to literary institutions chartered by the laws of the State," to inquire into its objects and to include in the decree or charter the amplified and particular terms found in the resolutions of a denominational convention constituting the plan upon which the institution was to be incorporated and built. (*Post, pp.* 330, 331.)

Acts cited and construed: Acts 1870-71, ch. 54.

10. **COLLEGES AND UNIVERSITIES.** Incorporation. Amendment of charter.

Resolutions of a denominational convention looking to the establishment and incorporation of a denominational university and stating the number of and character of the schools, its name, location, and board of trustees, and providing for general supervision by the bishops of that denomination, included in a charter incorporating the designated individual trustees, were not eliminated by an amendment empowering it to change its name and to increase or diminish the members of the board of trust, and passing to the university under its new name all rights, franchises, etc., originally conferred, but were rather confirmed by the amendment. (*Post, pp.* 331, 332.)

11. **COLLEGES AND UNIVERSITIES.** Organization. Foundation.

A convention of a religious denomination composed of delegates from participating conferences, without power to bind such conferences by its action, framed "articles of foundation" for a university for such denomination, named the board of trust to procure an act of incorporation, and authorized and enjoined such board, when incorporated, to seek and find a founder who would supply the necessary funds, and which prescribed $500,000 as the minimum amount upon which it could be founded, in pur-

State, ex rel. v. Vanderbilt University.

suance of which efforts to raise the needed amount were only partially successful, including a comparatively small amount given to secure a location. An individual donor gave it the amount necessary for foundation and afterwards gave the full endowment. *Held* that, in so far as the donor's conditions of his gift were valid, he, and not the individual incorporators, or the conferences they represented, was the founder and' original patron of the university upon the plans outlined by the convention.' (*Post, pp.* 332-335.)

Cases cited and approved: Dartmouth College Case, 4 Wheat., 574; Attorney-General v. Pierce, 2 Atk., 87; Nelson v. Cushing, 2. Cush. (Mass.), 527; State v. Toledo, 23 Ohio Cir. Ct. R., 327.

12. **COLLEGES AND UNIVERSITIES.** Organization. Incorporators as trustees.

Persons chosen by a convention of a religious denomination as a board of trustees to incorporate a denominational university and to administer it according to a plan formulated by the convention, who were incorporated by charter including such plan in full and describing the individual incorporators as representatives of the several conferences from which they came, were, under the charter and the law, trustees of the property for the purposes of the corporation, with all the lawful conditions imposed by the donor of the fund by means of which the university was established; the charter itself constituting a declaration of trust. (*Post, pp.* 335, 336.)

'Case cited and approved: Church v. Hinton, 92 Tenn., 188.

'Case- cited and distinguished: Nelson v. Cushing, 2 Cush. (Mass.), 527; State v. Toledo, 23 Ohio Cir. Ct. R., 327.

13. **COLLEGES AND UNIVERSITIES.** Incorporation. Governing boards and officers.

. The convention of a religious denomination, composed of delegates without authority to bind their conferences, adopted resolutions looking to the establishment of a denominational university to be called the "Central University of the Methodist Episcopal

Church, South," consisting of different schools, and to the rais-
ing of a minimum amount as a foundation, and appointed a
board of trust to obtain a charter which should provide for a
fair representation in its management to any patronizing con-
ference, and that the board of trust should make all by-laws
necessary to carry out such resolutions. After incorporation
the board first allowed each conference four members, which
number was subsequently reduced to one, and changed their
election from nomination by the conferences and confirmation
and election by the board to nomination by the board and con-
firmation by the conferences, and afterwards admitted mem-
bers not representing or confirmed by the conferences, and
finally terminated relations with the conferences by mutual
consent, and substituted therefor the general conference of the
whole denomination, which was to confirm members elected
by the board. *Held* that, under such resolutions and by-laws
and their practical construction, the relation between the board
and the conferences, and afterwards between it and the general
conference, was not one of ownership by the conferences, but
of co-operation and representation in its management, and that
such relation was a trust relation, which neither party could
ignore or violate. (*Post, pp.* 337-341.)

14. **COLLEGES AND UNIVERSITIES. Powers. By-Laws.**

A denominational university, incorporated for educational pur-
poses and the management of property by officers and trustees,
had the implied power to pass by-laws and to enter into agree-
ments relating to the appointment and election of members of
its board of trustees. (*Post, p.* 341.)

15. **CORPORATIONS. By-Laws. Requisites and effect.**

The by-laws of a corporation must be consistent with the spirit
and terms of its charter, and while in force they become as
much a part of the law of the corporation as though they had
been made a part of the charter; and a by-law of a nonstock-
holding corporation entering into a declaration of trust between
the corporation and its beneficiaries, could not be repealed, so
as to deprive the parties of their rights thereunder. (*Post, pp.*
341, 342.)

State, ex rel. v. Vanderbilt University.

Cases cited and approved: Kent v. Quicksilver Mining Co., 78 N. Y., 179; Matthews v. Associated Press, 136 N. Y., 333.

16. **CHARITIES. Administration. Visitation.**

At common law visitorial power was a property right belonging to the first donor and founder of a charity, arising by implication from the gift, and which might be vested by him in his appointee. (*Post, pp.* 342-347.)

17. **COLLEGES AND UNIVERSITIES. Governing boards.' Officers. Visitation. Supervision.**

Under a charter of a denominational university founded by an individual donor, including a resolution of a previous convention to the effect that the bishops of the Methodist Episcopal Church, South, be and be requested to act as a board of supervision of the university or any of its departments and jointly with the board of trust to elect officers and professors and prescribe the course of study and plan of government, etc., but without appointing the bishops to anything, the college of bishops was not vested with the common-law right of visitation over the corporation; the power of "supervision" not being equivalent to or necessarily including that of visitation. (*Post, pp.* 342-347.)

Acts cited and construed: Acts 1857-58, ch. 32.

Cases cited and approved: Dartmouth College Case, 4 Wheat., 563; Allen v. McKean, 1 Sumn., 276; Sanderson v. White, 18 Pick. (Mass.), 328.

Cases cited and distinguished: Phillips v. Bury, 2 Term R., 352; Green v. Rutherforth, 1 Ves. Sen., 471.

18. **COLLEGES AND UNIVERSITIES. Right of Visitation. Estoppel.**

In such case the college of bishops, who had assumed and exercised uncertain and occasional rights and privileges, and a part of whose number had at one time been elected to active membership in the board of trust, and who for nearly forty years after the charter was granted and they had declined all official

relations to the corporation had asserted no common-law right of visitation, were estopped from asserting such right. (*Post.* *p.* 347.)

Acts cited and construed. Acts 1895, ch. 6.

19. **STATUTES. Subjects and titles. Statute relating to corporations.**

Acts 1895, ch, 6, entitled "An act for the benefit of incorporated educational institutions," by section 1 empowering such institutions to acquire and hold property, and by section 2 providing that any religious denomination maintaining or patronizing such institution should have certain powers in the election of directors and trustees, in filling vacancies, and in increasing or diminishing the number of members thereof and authorizing the consolidation of two or more such institutions, did not violate Const., art. 2 sec. 17, providing that no bill shall embrace more than one subject, to be expressed in the title; such title being general enough to include all the provisions of the act, within the rule that generality of title is not objectionable, so long as it is not made to cover legislation incongruous in itself, or which may not be considered as having a necessary or proper connection with the subject expressed. (*Post, pp.* 349-351.)

Constitution cited and construed: Art. 2. sec 17.

Case cited and approved: State, ex rel. Dobson v. Washington & Tusculum College. (Mss., Knoxville, September Term, 1912).

Case cited and distinguished: State v. Yardley, 95. Tenn., 546.

20. **COLLEGES AND UNIVERSITIES.** Officers and governing boards. Statutes. "Patron."

Acts 1895, ch. 6, by section 1 empowered educational institutions to acquire and hold property, and by section 2 provided that, whenever such institution was established and was being maintained and patronized, or, having been otherwise established, was being maintained and patronized by any religious denomination, the representative governing board of such denomination might, at its option, elect its board of directors or trustees,

or fill vacancies therein, or change the number of members thereof. A denominational university, designated as the "Central University of the Methodist Episcopal Church, South," was incorporated on petition of the individual members of its board of trust, and an effort to raise by subscriptions from the conferences and churches the required endowment of $500,000 resulted in subscriptions for about $100,000, from which about $15,000 was realized, devoted to an incidental "sustentation fund" for students, and in contributions of about $50,000 for the purchase of its campus and erection of its buildings, and about $325,000 for specific endowments of chairs, lecture courses, and scholarships, nearly all of which were in the theological school, without to any extent relieving the general endowment from allowances to that department. Soon after its incorporation a wealthy layman, through the bishop, gave to the university $500,000, and an equal amount to complete its entire endowment, members of his family also giving another $1,000,000, whereupon the name of the university by resolution was then changed to that of such donor. *Held*, that according to the dictionary definitions of "establish," "maintain," and "patronize," and of "patron" as an endower or a perficient founder, to establish, maintain, and patronize meant to found and support, he was its patron and founder, and that the denomination had not maintained and patronized the university, so as to entitle its general conference to elect the board of trust or fill vacancies therein. (*Post, pp.* 351-356.)

Cases cited and distinguished: Phillips v. Bury, 2 Term R., 346; Dartmouth College Case, 4 Wheat., 563; Carson v. Carson. 115 Tenn., 50.

21. **COLLEGES AND UNIVERSITIES.** Officers and governing boards. Statutes.

Acts 1895, ch. 6, entitled "An act for the benefit of incorporated educational institutions," by section 2 provided that whenever any such institution shall be maintained and patronized by any religious denomination, the representative governing body of such denomination shall have power to elect its board of

directors or trustees to fill vacancies therein, and, with the consent of such board, to change the number of members thereof, did not apply to a denominational university chartered under the general incorporation act (Acts 1871, ch. 54), providing by section 9 that the chancery court might incorporate institutions of learning with the powers and privileges prescribed by Code 1858, sec. 1471, *et seq.*, which authorized members of a corporation to fix the number of trustees, subsequently required by Shannon's Code, sec. 2520 to be not less than five nor more than thirty-three, all of whose incorporators chose to act as trustees, but dealt only with the election of directors or trustees, and not with members of the corporation, and applied rather to educational institutions organized under Acts 1875, ch. 142, sec. 2, or similar acts, and under the patronage of some religious denomination. (*Post, pp.* 356-364.)

Acts cited and construed: Acts 1889, ch. 181; Acts 1875, ch. 142.

Code cited and construed: Sec. 2520 (S.).

22. **COLLEGES AND UNIVERSITIES.** Claim of parties. Renunciation.

If the general conference should voluntarily renounce the right to confirm persons elected to the board of trust, or cease to cooperate with the university, its right to membership in the board of trust and in its management, the board could act independently of the conference in the election of members of the board. (*Post, p.* 364.)

23. **COLLEGES AND UNIVERSITIES.** Officers and governing boards. Tenure.

Under the inherent power of the board of trust of an incorporated denominational university to fill vacancies in its own body, new members elected and installed by it were entitled to their seats on the board *ad interim* until such time as they should be rejected by the general conference, or its general board of education, acting for it and under its authority, in pursuance of an agreement between the board of trust and the general confer-

State, ex rel. v. Vanderbilt University.

ence whereby the board was to appoint and the general conference to confirm the trustees. (*Post, p.* 365.)

LANSDEN, J., dissenting in part.

FROM DAVIDSON.

Appeal from Chancery Court, Davidson County.—
JOHN ALLISON, Chancellor.

JOHN BELL KEEBLE, J. J. VERTREES, J. C. BRADFORD, and CHAS. C. TRABUE, G. T. HUGHES, and J. M. ANDERSON and JORDAN STOKES, SR., for appellants.

A. B. ANDERSON and P. D. MADDIN, FITZHUGH & BIGGS, E. C. O'REAR, and HARRIS & HARRIS, for appellees.

MR. JUSTICE TURNER delivered the opinion of the Court.

The bill in this case was filed by the State, on the relation of the College of Bishops of the Methodist Episcopal Church, South, and three gentlemen, who had been elected by the General Conference of the Church to fill vacancies in the Board of Trust of Vanderbilt University, against the University, as a corporation, and its Board of Trust, and three other gentlemen who had been elected by the Board of Trust to fill the aforesaid vacancies in that board, and seeks

129 Tenn.—19

to enjoin the board from admitting its own appointees, and to compel it to seat those elected by the General Conference.

Two answers are filed, one by the majority of the trustees, their appointees, and the University, contesting the bill, and the other by a minority of the trustees, admitting the rights claimed by the complainants, and joining in the prayer of the bill.

On the hearing in the court below, the chancellor granted the relief prayed for by the bill, and the University and majority trustees and their appointees have appealed and assign errors in this court.

Two questions are involved, to wit: Whether the General Conference had the right to elect the members of the Board of Trust, and whether the College of Bishops had visitorial power over the University and the right to veto the action of its Board of Trust.

The pleadings and proofs are very voluminous. On the hearing below, exceptions were taken to much of the evidence as hearsay, irrelevant, and immaterial. The chancellor overruled the exceptions and admitted all the evidence. The objection is not preserved or made in this court, and hence the whole proof is before us for what it is worth. A large part of it is immaterial to the real issues in the cause.

The essential facts, appearing in the pleadings and proof, are as follows:

In the fall of 1871, eight or nine of the annual conferences of the Methodist Episcopal Church, South, appointed committees ''to confer'' with each other,

"in reference to the establishment and endowment of a Methodist University of high grade and large endowment," but, as stated in one of the resolutions appointing such committee, "it being understood that said committee shall not have authority to pledge this conference to any action." Some of these annual conferences were incorporated and some not; but all were composed of the ministers and lay delegates from the churches within certain territory assigned to each, and each had jurisdiction over the churches within the district so assigned.

In January, 1872, the several committees appointed by these annual conferences met at Memphis, were presided over by some of the bishops, and, after conferring and discussing the subject for three days, adopted certain resolutions prepared by Bishop McTyeire, as follows, to wit:

"Resolved by the Convention: 1. That measures be adopted looking to the establishment, as speedily as practicable, of an institution of learning of the highest order, and upon the surest basis, where the youth of the church and country may prosecute theological, literary, scientific, and professional studies to an extent as great, and in a manner as thorough as their wants demand.

"2. That the institution shall be called the Central University of the Methodist Episcopal Church, South.

"3. That it shall consist, at present, of five schools or departments—viz.: A theological school, for the training of young preachers, who, on application for

admission, shall present a recommendation from a quarterly or annual conference, and shall have obtained a standard of education equal to that required for admission on trial into an annual conference; and instruction to them shall be free, both in the theological and the literary and scientific departments. Secondly, a literary and scientific school. Thirdly, a normal school. Fourthly, a law school. Fifthly, a medical school.

"4. That the sum of one million dollars is necessary in order to realize fully the object desired, and not less than five hundred thousand dollars must be secured as a condition precedent to the opening of any department of the university.

"5. That the location of the university shall be left to the decision of the College of Bishops of the Methodist Episcopal Church, South,

"6. That the carrying out of this whole scheme is hereby committed to the following persons, viz.: William C. Johnson, Robert J. Morgan, Smith W. Moore, Milton Brown, Alexander L. P. Green, Jordan Stokes, David C. Kelley, Edward H. East, Robert A. Young, Landon C. Garland, Phillip Tuggle, John M. Steele, James H. McFerrin, Christopher D. Oliver, William Dickson, Edward Wadsworth, William Byrd, William L. C. Hunnicutt, Thomas Christian, James L. Borden, William H. Foster, Andrew Hunter, James L. De Yampert, and David T. Reynolds, who shall take immediate steps for securing a suitable charter of incorporation, and shall be a Board of Trust, with power to

solicit and invest funds, appoint an agent or agents, and to do whatever else is necessary for the execution of this scheme.

"7. That seven of the Board of Trustees, at any meeting regularly called, shall constitute a quorum.

"8. That provision be made in the charter for giving a fair representation in the management of the university to any annual conference hereafter cooperating with us.

"9. That the bishops of the Methodist Episcopal Church, South, be, and are hereby, requested to act as a board of supervision of the university or any of its departments, and jointly with the Board of Trust to elect officers and professors, and prescribe the course of study and plan of government."

On the day after the Memphis convention adjourned, this Board of Trust, so designated and appointed, met and organized by electing a president, secretary, treasurer, and executive committee. The latter were "requested to prepare a code of by-laws, defining the duties of officers and standing committees, and such other by-laws as may be necessary for the government of the operations of the Board of Trust." They adjourned to May 8, 1872, at which time they met at Nashville, where the College of Bishops was then in session. They addressed to the bishops the following communication, to wit:

"Whereas, the convention left the location of the university to the decision of the College of Bishops of the M. E. Church, South, and also requested the bishops

to act as a board of supervisors of the university, or any of its departments, and jointly with the Board of Trust to elect officers and professors, and prescribe the course of study and the plan of government:

"Resolved: (1) That the secretary be and is hereby directed to address the bishops with the view of obtaining their acceptance of the foregoing official relation to the university.

"(2) That the secretary invite the bishops to attend the present meeting of the Board of Trust."

On the next day the bishops made the following reply (having first voted down a motion to decline the request outright) to wit:

"Resolved: (1) That the College of Bishops accede to the request, made by the Board of Curators of the contemplated university, to locate the institution whenever the sum of $500,000 shall be pledged for the enterprise.

"(2) That, by this act, we are not to be understood as implying that the said institution is to be considered connectional, to the damage of existing colleges and universities. We can take no official relation to the Central University that will discriminate between it and any and every other institution of the church. Nevertheless, we feel free to give our decided approval to the combination of the several annual conferences represented in the convention in Memphis, or so many of them as shall agree together, acting through respective bodies in getting up an institution of the highest grade.

"(3)  That, as the question of theological schools is in a controversy among our people, we propose no action that may be construed into an expression of our collective opinion on the subject, but it is made a condition of the first resolution that the theological department, to be comprised  .  .  .  with the literary and professional departments of the proposed Central University, be such as is consistent with the action of the General Conference held in Memphis in 1870, in the words following:

" 'Resolved, that we indorse the action of the last General Conference, in reference to Biblical chairs, in connection with out existing colleges, as the best available means for training young preachers.' "

To this the board responded:

"Resolved, that the terms and conditions upon which the bishops of the church are willing, in due time and proper form, to accede to the request made of them by the late educational convention, held in Memphis, to locate this proposed university, are, in the judgment of the board, sufficient to encourage it in the prosecution of this scheme of education, contemplated by said convention, and as such they are hereby accepted and will be observed in good faith by this board."

On June 29, 1872, the individuals named by the Memphis convention as the Board of Trust filed their petition in the chancery court at Nashville, praying the court "to incorporate them under the name and style of the Central University of the Methodist Episcopal Church, South, for the purpose of soliciting sub-

scriptions, donations, and for the erection and maintenance of an institution of learning of the highest order, containing all the schools belonging to a university of that character, together with the rights, powers, and privileges which by law may belong to literary institutions chartered by the laws of the State. They pray to this end that the required publication may be made and all other necessary and proper steps may be taken.''

Publication was duly made in accord with the petition and as prescribed by law.

On August 6, 1872, decree was entered on this petition, constituting the charter of the university, as follows, to wit:

''The Central University of the Methodist Episcopal

Church, South. *Ex parte.*

''This matter came on this day to be heard before the Hon. Nathaniel Baxter, judge, etc., of the circuit court of Davidson county, sitting by interchange with Hon. Edward H. East, the chancellor presiding, but who was incompetent to preside and hear this cause, for the reason that he was interested herein, and the same was heard upon the petition of W. C. Johnson, Robert J. Morgan, Smith W. Moore, and Milton Brown, citizens and residents of the State of Tennessee, and representatives of the Memphis Conference of the Methodist Episcopal Church, South; and Alexander L. R. Green, Jordan Stokes, David C. Kelley, Edward H. East, David T. Reynolds, and Robert A. Young, citi-

zens and residents of Tennessee, and representatives of the Tennessee Conference; and Landon C. Garland, a citizen and resident of Mississippi, and Phillip Tuggle, a citizen and resident of Tennessee, the two latter representing the North Mississippi Conference; and James H. McFerrin and John M. Steele, citizens of the State of Arkansas, and representatives of the White River Conference; and Christopher D. Oliver, and William Dickson, citizens of the State of Alabama and representatives of the North Alabama Conference; and Edward Wadsworth and W. M. Byrd, citizens of the State of Alabama, and representatives of the Alabama Conference; and W. L. C. Hunnicutt and Thomas Christian, citizens of the state of Mississippi, and representatives of the Mississippi Conference; and James L. Borden and William H. Foster, citizens of the State of Louisiana, and representatives of the Louisiana Conference; and Andrew Hunter and J. L. De Yampert, citizens of the State of Arkansas, and representatives of the Little Rock Conference. And it appearing to the court that said persons, in their said petition, prayed to be incorporated under the name and style of the Central University of the Methodist Episcopal Church, South, the object and plan of said university having been fully set forth in resolutions passed by the delegates of said conferences, at a convention of the same, held in the city of Memphis on the 24th, 25th, 26th, and 27th of January, 1872, and which resolutions are in words and figures as follows: [Here follow the Memphis resolutions.]

"And it appearing to the court that, upon the filing of said petition, the clerk and master of this court caused, by an order at rules, the same to be advertised, in pursuance of the statutes in such cases made and prescribed; and it further appearing to the court that no one has appeared and made known any objection to the granting of the prayer of the petition; and the court, upon inspection of the designs and objects of said corporation, finds nothing therein contained to be against public policy or good morals, or in conflict with the Constitution and laws of the State or of the United States, is pleased to grant the prayer of the same, and doth hereby order and adjudge and decree that the petitioners be declared a body politic and corporate under the name and style of the Central University of the Methodist Episcopal Church, South, and in that name may sue and be sued, plead and be impleaded, in the courts of this State or of the other States of the Union, or of the United States of America; may have a common seal, which may be altered at pleasure; shall have perpetual succession; may solicit and receive subscriptions, donations, legacies, and devises; may hold real estate and personal property in such amounts as the business of the corporation requires, and may receive the same by contract, gift, will, or devise, and shall hold the same for the purpose of said corporation, with all the lawful conditions imposed by the donor; may appoint such subordinate officers and agents as the business of the corporation requires, prescribe their duties, and fix their compensa-

tion; to make by-laws not inconsistent with the laws of the land or this charter, or the resolutions of the convention at Memphis, as set out hereinbefore, which resolutions are hereby adopted as a part of this charter, but shall make all by-laws necessary and proper to carry out the object of said resolutions, as well as for the management of its property and the regulation of its affairs, and may also have power to pass all by-laws necessary to the use of the powers herein given, or which by law may hereafter be conferred, and all said powers, rights, and privileges, together with such others as are not herein specially given and referred to, are hereby conferred upon said corporation in as full, complete, and ample manner as by the laws of the State the same can or might be; and said corporation shall have the power to confer all the degrees of merit and honor usually conferred by universities.  It is further decreed that petitioners pay the costs of this proceeding, and that the clerk and master issue to them a certified copy of this decree.''

On August 22, 1872, at Iuka, Miss., the board met, accepted the charter, confirmed the previous election of officers and executive committee, and adopted by-laws, one of which was as follows:

''No. 2.  Since the charter leaves the perpetuity of the board in its own power, we request the several annual conferences co-operating to nominate at least four representatives from each.  So soon as this shall be done, the present board will reorganize in such manner as to secure the election of trustees so nomin-

ated, and that thereafter, when vacancies shall occur, they shall be filled by nominations by the several annual conferences and confirmed by the board; it being understood that the board will not be enlarged beyond the first number, except so far as shall be necessary to give four members to each one of the conferences co-operating.''

They also: ''Resolved, The executive committee are empowered, through such agents as they may employ, to adopt such scheme, or schemes, as they may deem best in order to obtain the endowment, with the single reservation that none of the principal shall be used for any purpose other than that originally intended by the donor, and that we advise that interest, in all available cases, be collected semiannually. That the executive committee be required to get up definite printed forms for notes, gifts, bequests, etc.''

They also formulated and adopted a report or address to the bishops and annual conferences, soon to be assembled, in which they recited the previous appointment of committees, their meeting and proceedings at Memphis, the appointment of this Board of Trust, and its proceedings as hereinbefore stated, setting out in full the charter, the communications to and from the bishops, and said by-law No. 2, above quoted, and saying, among other things:

''There was secured the cordial approval of the College of Bishops in behalf of an enterprise which promises, in connection with our other institutions of learn-

ing, to accomplish a great work for Christian education under Methodist direction and control.

"It remains for the action of the convention and the Board of Trust appointed by it to receive the sanction, not only formal, but hearty, of the several annual conferences represented in the convention, and not only their sanction, but their co-operation in the use of all the means at their command. . . .

"The action of the convention and of the Board of Trust is now before you.

"It has all been taken with the best light at hand, and, at the same time, in deference to the fact that it requires your sanction and co-operation, as well that it may be binding upon you as that it may result in the success of the enterprise itself, the importance of which, we doubt not, is estimated very highly by you, as it is by ourselves. . . .

"Asking your sanction and co-operation with us, in behalf of the university, and particularly your aid in the organization of a system of agencies for procuring an endowment fund of $500,000, we now commit this whole subject to your deliberation and action."

This report, or address, was printed in pamphlet form, and furnished, during the fall of 1872, to the several annual conferences concerned. Six of the conferences in question approved, nominated trustees as provided in by-law No. 2, most of whom were already members of the board, and agreed to co-operate in efforts to raise the required endowment. The other conferences failed to act or approve.

On January 16, 1873, the board met at Brownsville, Tenn., elected the new members, nominated by the conferences, reduced the number, representing the Tennessee Conference, from six to four, by requesting and accepting the resignations of two of their number, that each conference should have an equal representation in the board, and passed the following resolutions:

"Resolved: (1) That the members previously in the board under the charter, with those now elected, are hereby in due form recognized as the representatives of their several annual conferences which have resolved to co-operate in behalf of the Central University, there being four from each annual conference, viz.: Tennessee, Memphis, North Mississippi, White River, Little Rock, and Arkansas.

"(2) That we hereby declare vacant the seats as members of the board under the charter of those persons, all of them now absent, heretofore recognized as representatives of the North Alabama, Alabama, Mississippi, and Louisiana Conferences; those conferences having failed to take action in favor of the Central University."

They also revised their code of by-laws, substituting for former by-law No. 2 new by-law VII: "Each co-operating conference, being entitled to four members or representatives in the Board of Trust, should any vacancy or vacancies occur the board shall fill the same upon the nomination of the conference to be represented"—and added No. VIII: "These by-laws

may be amended at any annual meeting of the board by a two-thirds vote of all the members present.''

On March 26, 1873, at a called meeting of the board in Nashville, Bishop McTyeire, ''after an explanation highly satisfactory to the board,'' submitted a letter from Mr. C. Vanderbilt, dated March 17, 1873, as follows, to wit:

''To Bishop H. N. McTyeire, of Nashville:

''I make the following offer through you to the corporation known as the Central University of the Methodist Episcopal Church, South:

''First—I authorize you to procure suitable grounds, not less than from twenty to fifty acres, properly located, for the erection of the following work:

''Second—To erect thereon suitable buildings for the uses of the university.

''Third—You to procure plans and specifications for such buildings and submit them to me, and, when approved, the money for the foregoing objects to be furnished by me as it is needed.

''Fourth—The sum included in the foregoing items, together with the 'endowment fund' and the 'library fund,' shall not be less in the aggregate than five hundred thousand ($500,000) dollars, and these last two funds shall be furnished to the corporation as soon as the buildings for the university are completed and ready for use.

''The foregoing being subject to the following conditions:

"First—That you accept the presidency of the Board of Trust, receiving therefor a salary of three thousand ($3,000) dollars per annum and the use of dwelling house, free of rent, on or near the university grounds.

"Second—Upon your death or resignation, the Board of Trust shall elect a president.

"Third—To check hasty and injudicious appropriations or measures, the president shall have authority, whenever he objects to any act of the board, to signify his objections in writing within ten days after its enactment, and no such act to be valid unless, upon reconsideration, it be passed by a three-fourths vote of the board.

"Fourth—The amount set apart by me as an endowment fund shall be forever inviolable, and shall be kept safely invested, and the interest or revenue only used in carrying on the university. The form of investment which I prefer, and in which I reserve the privilege to give money to said fund, is in seven per cent. first mortgage bonds of the New York Central & Hudson River Railroad Company, to be registered in the name of the corporation, and to be transferrable only upon a special vote of the Board of Trust.

"Fifth—The university is to be located in or near Nashville, Tennessee.

"Respectfully submitted,
"C. VANDERBILT."

Thereupon, with a suitable preamble, the board adopted the following resolutions:

"Resolved, 1.  That we accept with profound grati-
tude the donation, with all the terms and conditions
specified in said proposition.

"Resolved, 2.  That, as an expression of our ap-
preciation of this liberality, we instruct the committee,
hereinafter mentioned, to ask the honorable chancery
court to change the name and style of our corporation
from the 'Central University' to the 'Vanderbilt Uni-
versity,' and that the institution thus endowed and
chartered shall be, from henceforth, known and called
by this name.

"Resolved, 3.  That the Hon. M. Brown, the Hon.
E. H. East, and the Rev. D. C. Kelley, D. D., be and
they are hereby authorized and requested to obtain
at the earliest practicable day such modifications of
our charter as will enable this board to conform its
future operations to the conditions aforesaid.

"Resolved, 4. That the secretary is requested to con-
vey to Mr. C. Vanderbilt the sincere thanks of this
board and a copy of these resolutions."

Bishop McTyeire had not solicited this donation,
but, while lately in New York, was a guest of Mr. C.
Vanderbilt in his home (their wives being cousins),
and evidently had acquainted Mr. Vanderbilt with the
project of this university, and probably furnished him
a copy of the printed pamphlet, hereinbefore referred
to, containing its charter, by-laws, etc., which had been
submitted to the conferences; and Mr. Vanderbilt was

so impressed with the enterprise that he voluntarily made the proposition aforesaid.

Thereupon the then president, Judge Milton Brown, resigned, and the board elected Bishop McTyeire, not previously a member, president of the Board of Trust, which position he held during his life.

On April 23, 1873, in the chancery court at Nashville, a petition to amend its charter was filed by the university, as follows:

"The Central University of the Methodist Episcopal Church, South.  Ex parte.

"To the Hon. W. F. Cooper, Chancellor, etc.:

"The petition of the Central University of the Methodist Episcopal Church, South, a corporation chartered heretofore by the chancery court at Nashville.

"Petitioner would state to your honor that heretofore, by a decree of record in this court, it was chartered as a university of learning. A certified copy of its charter is here filed, marked 'Exhibit B,' and made a part of this petition. Since it has obtained its charter, its condition is so altered that it now desires to have an amendment to its said charter, which amendments are as follows:

"It having been thought politic to limit the number of the Board of Trust to four from each co-operating conference, the names of Jordan Stokes and Robert A. Young be dropped from the list. Some conferences not having co-operated in the purposes of said institution, it is now desirable to omit from the list of trustees

the names of the persons heretofore incorporated, and who represented said conferences, as follows, viz.: Christopher D. Oliver and William Dickson, of the North Alabama Conference; Edward Wadsworth and W. W. Byrd, of the Alabama Conference; W. L. C. Hunnicutt and Thomas Christian, of the Mississippi Conference; and James L. Borden and William H. Foster, of the Louisiana Conference.

"A large donation having been made to petitioner by C. Vanderbilt, of New York, of not less than $500,000, as set out in 'Exhibit C,' herewith filed, and made a part of this petition, petitioner prays that its name and style be changed to that of the 'Vanderbilt University,' and that the terms and conditions of said gift be incorporated as a part of said charter.

"Petitioner also prays that the words, 'or the resolutions of the convention at Memphis, set out herein, which resolutions are hereby adopted as a part of this charter,' on page 12 of the printed charter here filed, be stricken out and omitted, and that said charter may be so altered and amended as to read as set out in 'Exhibit D,' here filed and made a part of this petition. Petitioner asks that this be done, in order that the ends of its creation may be the more readily attained.

"Petitioner prays general and full relief in the premises.

"EDWARD H. EAST, Solicitor."

Publication was duly made as required by law, and on June 16, 1873, Chancellor Cooper pronounced and entered the following decree:

"In the Matter of the Central University of
the    Methodist    Episcopal    Church,
South.

"This matter came on this day to be heard before
the chancellor upon the petition heretofore filed, and
publication of the matter thereof having heretofore
been made according to the statutes in such cases made
and provided, the court is pleased to order and decree
that the name and style of the Central University of
the Methodist Episcopal Church, South, a corporation
heretofore chartered under the Constitution and laws
of this State as a university of learning, and with all
the powers, rights, and privileges of such corporations
as are now given and conferred by the laws of the
State of Tennessee, or may hereafter be given or con-
ferred, be changed to the name and style of the Vander-
bilt University, by which name it shall hereafter be
known, and sue and be sued, hold and receive property,
confer degrees, and do any and all things which, by
the present and future laws of Tennessee, it may be
empowered to do.

"It is further decreed that all the rights of property,
powers to contract, privileges, immunities, and fran-
chises, which heretofore by law, under the decree of
this court were conferred upon the said corporation
under the name and style of the Central University of
the Methodist Episcopal Church, South, and the prop-
erty or rights thereof which have heretofore been se-
cured to said corporation, pass to the Vanderbilt Uni-
versity, and its assigns and successors, forever, for the

purposes of said corporation, and that it have the power to pass by-laws, resolutions, etc., not inconsistent with the laws of the land, and to increase and diminish the number of its trustees and directors, and do and perform any and all acts allowable by law to corporations of learning. It is further decreed that the said Vanderbilt University pay the cost of this proceeding, for which *fi. fa.* issue.''

In the meantime, Bishop McTyeire and the board proceeded to acquire the grounds, procure plans for buildings, etc., as provided by Mr. Vanderbilt's offer and otherwise carry out its terms and conditions.

Citizens of Nashville contributed about $30,000 toward the purchase of the campus of the university.

From time to time within the next year or two Mr. C. Vanderbilt increased his donations to a million dollars, and subsequently other members of the Vanderbilt family added to the funds of the university, for its enlargement and endowment, in round numbers, another million dollars.

At the time of Mr. C. Vanderbilt's first gift, subscriptions from other persons in small amounts and of no very considerable aggregate had been procured by the financial agents of the university, but little or nothing had been paid thereon. The whole amount promised fell far short of the minimum upon which, under the Memphis resolutions, the board was authorized to open any department of the university. Hence, at that time the board resolved ''that our agents be requested to double their diligence to secure, if pos-

sible, the remaining half million of endowment, by the ensuing sessions of the annual conferences.''. This, however, they never succeeded in doing.

It further appears that whatever funds were realized from subscriptions previous to the Vanderbilt gifts were subsequently devoted to the ''sustentation fund'' to pay the personal expenses of students in the theological department.

After the original Vanderbilt gift, other donations were made to purchase the campus, for special endowments of particular chairs, scholarships, and other specific purposes; but it does not appear that any-. thing was added to the general endowment of the university, except by Mr. C. Vanderbilt himself and other members of the family.

Now, reverting to the proceedings of the Board of Trust, we find that at a meeting on January 14, 1874, they accepted the amended charter, again resolved to exclude members from the nonparticipating conferences, and that the six co-operating were entitled to representation.

At their meeting on September 30, 1874, Bishop McTyeire announced the death of Dr. Green, one of their members, and in his address stated:

''Another vacancy or two will occur in the board by the transfer of members beyond the patronizing conferences. I suggest that it is very important so to amend the by-laws that this board may have the initiative in filling vacancies by nominations of the successors, the conferences confirming. This reverses the

2 Thompson] DECEMBER TERM, 1913.          311

State, ex rel. v. Vanderbilt University.

order followed in originally making up the board. For obvious reasons, while as yet the patronizing conferences were to be determined by their own action, it was left to them, as they concurred in the plan outlined by the convention at Memphis, to name persons to represent them in organizing.

"But since the charter leaves the perpetuity of the board in its own power, we should keep up the conference representation on the principle here suggested The constituency, the fitness and the safety of the board, having this vast and growing interest in trust, will be very uncertain if, by popular election on hasty and perhaps ill-considered grounds of choice, its future members are to be supplied; whereas, the board knows its own wants, is familiar with the nature of the work to be done, has the university and its interests in mind and on heart, and is ever watchful of its welfare and on the lookout for suitable instruments and agents to promote it. As the whole matter is covered by a resolution of your body, it may be adjusted readily; and a precedent should now be set in filling the first vacancies. If possible, this board should send up its nominations to the ensuing conferences. This course is not only demanded by provident wisdom, but is in analogy with other and the oldest institutions of learning under the care of the church. The board elects or nominates, and the annual conference confirms."

Whereupon the board passed what is known as the Garland Resolution:

"Forasmuch as the charter of Vanderbilt University confers upon its Board of Trust the exclusive right and power to fill vacancies that may occur in its own body, and as this power cannot be delegated to any other body of persons whatsoever: Therefore, be it

"Resolved, that this board will now proceed to fill the vacancies which have been created by the death of the late Dr. Green and by the transfer of the Rev. W. C. Hearn to the Denver Conference.

"But in order to maintain the closest connection with the patronizing conferences, the board submits these and every other election to fill a vacancy in its own body to the confirmation of the annual conference from which the election is made."

They then elected two trustees to fill these vacancies, and instructed the secretary to convey this information to the two conferences concerned, and ask for the confirmation of these elections; also to send a copy of the recorded action of the board, to wit, the Garland Resolution. The records of one of these conferences (Tennessee) show that this was done, and it made the following response:

"Resolved, 1. That in view of the relations already established by contract between the Tennessee Conference and Vanderbilt University, we proceed now to nominate one of our members to fill the vacancy in the Board of Trust, caused by the death of Dr. Green, and that we nominate Dr. R. A. Young.

"2. That, in response to the request of the Board of Trust, we consent to modify the original contract so that hereafter, when a vacancy occurs, the board may nominate one of our members to us for confirmation, the nominee not to be a member of the board until confirmed by us."

In the fall of 1874, the Alabama Conference, theretofore excluded for failure to co-operate under the charter, decided to come in, and nominated four members to represent it on the Board of Trust.

In May, 1875, the board rescinded its former action excluding members from the Alabama Conference, and elected the four named by that conference. At the same time, they amended their by-law VII to conform to the Garland Resolution, elected two new members to fill vacancies from the North Mississippi Conference, and directed that this action be reported to that conference for confirmation.

In 1880 the president, Bishop McTyeire, recommended that the members of the board be reduced from four to two from each conference, and that Louisville Conference, not heretofore connected with the enterprise, be admitted and represented on the board, as one of the co-operating conferences.

In 1881 a committee reported in favor of the proposed reduction and that it be referred to the conferences for concurrence.

This report was tabled and the matter referred to another committee, of which Judge East was chairman.

In 1882 this committee reported, "contrary to the view it first entertained that this matter was a charter question, that it is simply a by-law question, the charter being silent on the subject, and the whole matter is subject to by-law VII, and the by-laws may be changed or amended at any annual meeting of the board by a two-thirds vote of all the members present," and recommended a change of the by-law to that effect. The report was adopted and the by-law so amended. No action of the conferences was asked or taken on the subject.

In 1884 two members from the Louisville Conference were elected by the board and reported to the conference for confirmation.

In 1888 the term of membership was reduced by the board from life to eight years. This action was referred to the conferences for concurrence, and they approved.

In 1894 the board amended its by-laws so as to admit to membership, *ex officio,* the chancellor of the university and the bishops of the church, also "four additional members without regard to their location in any particular one of the patronizing conferences." Their election was not made subject to confirmation, and the board declined to make its amended by-law subject to the concurrence of the patronizing conferences.

In 1895 Chancellor Kirkland, in his address to the board, suggested that some change in the method of electing trustees and in the constitution of the board should be made so as to relate the university more

State, ex rel. v. Vanderbilt University.

closely to the whole church and constitute it the Central University of Southern Methodism. This was referred to a committee who, in 1896, reported as follows:

"I. We think it very important that Vanderbilt University should be closely allied to the whole church as the Central University of Southern Methodism.

"II. We believe this can be partially effected, even now, by increasing the number of trustees who are selected independently of our eight patronizing conferences.

"III. We recommend that the by-laws be amended so as to give only one representative to each of the eight patronizing conferences, and that the eight vacancies thus created be filled by the selection of representative men without regard to geographical limitation.

"IV. As the best method of effecting this result we suggest as the terms of the present members expire, the board select only one representative for each patronizing conference, and we suggest that each patronizing conference be requested to approve this change in the by-laws and accept the reduction from two to one representative."

The board adopted this report and amended its by-laws accordingly. The conference approved this action.

In 1897 the chancellor in his address suggested further changes along this line, and a committee, to whom the subject was referred, reported:

"We recommend that, in order that Vanderbilt University may be related to the church as the Central University of Southern Methodism, and may assume a connectional relationship to the whole church as the crowning feature of our educational system, the consent of the patronizing conferences be asked to the proposition that hereafter the Board of Trustees be selected from the entire church without regard to geographical limitation and to be confirmed by the General Conference. In order to secure such consent, the chancellor of the university is requested to submit this proposition to the several patronizing conferences at the next annual sessions. We furthermore suggest that a resolution be submitted to the next General Conference asking the adoption of this university as the central institution of the Methodist Episcopal Church, South."

This report was adopted, and a committee, composed of three bishops, appointed to prepare a memorial to the General Conference. This matter was referred to the annual conferences, and all except the Louisville Conference, which deferred action, passed resolutions, expressing willingness to transfer to the General Conference "all rights, title, and interest that we have in said university, and hereby solicit the co-operation of all the conferences represented, and the Board of Trust, in securing this desirable end.

"2. That until this is accomplished we adhere to the *status* secured to us by contract, which gives us a.

controlling voice in the appointment of our representatives on the Board of Trust.''

In 1898 the Louisville Conference took similiar action.

In the meantime the committee of the Board of Trust, composed of three bishops, presented to the General Conference of the M. E. Church, South, which met in Baltimore in May, 1898, a memorial as follows:

''The undersigned, constituting a committee appointed by the Board of Trust of Vanderbilt University, to make a special report to the General Conference of the M. E. Church, South, beg leave to present this communication with reference to the university and its relation to the whole church. Vanderbilt University, as is well known, has heretofore been the central institution of eight patronizing conferences. The title to the property is vested in a board, to be held in trust for these conferences of the Methodist Episcopal Church, South. For several years the board has had under consideration a plan to make the university entirely connectional and relate it directly to the whole church. The plan proposed is to have the patronizing conferences transfer their rights in the university to the General Conference, and to have the General Conference, by proper resolution, accept the patronage of the university and consent to assume toward this enterprise the same relation heretofore held by the separate conferences. The Board of Trust has officially expressed its approval of this plan, and most of the patronizing conferences have done the same thing.

"By the charter of the university the Board of Trust is vested with the power and obligation to fill its own vacancies; but the election of any member is not valid under the law of the university until said member has been confirmed by the conference which he is designed to represent. Under the new plan the board would be at liberty to select its members without geographical restrictions of any kind, and the General Conference would confirm or reject the appointment. This duty could be exercised either by the General Conference as a body, or it could be delegated by the conference to some board, itself the creature of the General Conference. Naturally the Board of Education will be thought of in this connection. This board meets every year, and is likely to be charged more and more with the oversight of our institutions of learning. It is now trying to devise methods for correlating all our colleges and universities, and it would be appropriate for the General Conference to exercise its control of Vanderbilt University largely through the board. In that manner vacancies in the Board of Trust of the university could be filled every year, and it would not be necessary to wait four years for action that might be promptly needed.

"As a committee, therefore, of the Board of Trust of Vanderbilt University, we beg to present this matter to the General Conference, and invite such action as may be adjudged right and proper.

"[Signed] A. W. WILSON.

"CHARLES B. GALLOWAY.

"EUGENE R. HENDRIX."

The General Conference accepted this proposal in the following resolutions:

"First, that the General Conference of the M. E. Church, South, hereby accepts the proposed relation and control of the Vanderbilt University and commits to the General Board of Education the confirmation of all trustees, selected by the Board of Trust of Vanderbilt University.

"Second. That this resolution take effect as soon as the consent of all the present patronizing conferences has been obtained, all the necessary legal steps taken, and preliminary details arranged."

This relation between the university and the General Conference was maintained from 1898 to 1910.

In 1905 the board repealed the by-law making the chancellor and bishops, thirteen in number, *ex officio* members, and adopted in lieu one making the chancellor and five bishops, selected according to their seniority, regular members of the board, and made nominations accordingly to the General Board of Education for confirmation.

The board at the same time determined to take out an amended charter, under Acts 1875, ch. 142, prepared and signed an application therefor, but some of the members subsequently withdrew their names and it was not filed. These and other matters created some dissatisfaction in the minds of some of the bishops and members of the General Conference, and hence at its session in 1906 the General Conference

adopted a report of its Committee on Education in part as follows:

"There can be no question as to the ownership of the university by the Methodist Episcopal Church, South, or as to the charter rights of all the bishops; but, in view of certain questions which must be authoritatively decided, we recommend the appointment by this General Conference of a commission of five laymen of the Methodist Episcopal Church, South, as follows:

"1.   To inquire into and determine the present relations of the Vanderbilt University to the Methodist Episcopal Church, South.

"2.   To take legal steps, if necessary, to perfect the transfer of the University from the patronizing conferences to the General Conference of the Methodist Episcopal Church, South.

"3.   To define the charter rights of the bishops of the Methodist Episcopal Church, South, and, when so defined, the bishops are hereby instructed to enter on the same."

That commission was composed of five eminent lawyers, who after extended investigation, and hearing of all who cared to be heard, made to the General Conference, at its session of 1910, an extended report (previously prepared and filed in December, 1906) and its conclusions are fairly well summarized by appellants, as follows:

"(a)   That the petitioners who applied for and obtained the charter of the university, and who were

thereby declared to be the 'body politic and corporate,' were not the members of the corporation, but that the co-operating annual conferences were the real members of the corporation; and

"(b) That the university was not founded by Mr. Vanderbilt, but by the annual conferences; and

"(c) That since 1898 the General Conference, as assignee of these annual conferences, had been the member, and the sole member, of the corporation; and

"(d) That the bishops had no authority in law or power under the charter as members, either of the corporation or of the Board of Trust, and either alone or jointly with the board, or as members *ex officio;* but

"(e) That, by virtue of the ninth of the Memphis Resolutions, made a part of the charter, the bishops were visitors of the university, with common law visitorial powers."

A copy of this report was filed with the Board of Trust, who passed the following resolutions:

"Resolved, 1. That we cordially receive the same, and direct that it be filed with the records of this board.

"2. That we hereby express our appreciation of the ability and fidelity with which the members of the commission have discharged their important duties.

"3. That, recognizing and rejoicing in the ownership of the church in the university and all the responsibilities arising therefrom, we welcome any supervision by the College of Bishops that may aid us in executing the great trust committed to our hands,

129 Tenn.—21

so as to insure the observance of the charter, the conditions of specific gifts, and the statutes of the State.''

Complainants now insist that this was an acceptance by the board of the conclusions of the commission. The chairman of the commission did not so construe it, and in this view the General Conference and its Committee on Education seem to have agreed with him, and so do we. We need not inquire what effect, if any, such an acceptance would have.

The General Conference adopted the report, and resolved, in part, as follows:

''Resolved, first, that this General Conference hereby accepts the report of the Vanderbilt Commission as a definition of the rights of the Methodist Episcopal Church, South, to Vanderbilt University; moreover, that it accepts the judgment of the commission that the College of Bishops is a board of common law visitors of the university; and, furthermore, that it accepts the finding of the commission that the General Conference has the right to select the Board of Trustees in such manner as it may elect, either by direct election by the conference itself or through such agency, or agencies, as it may designate.

''Resolved, second, that it is the sense of this General Conference that its right to select the Board of Trust of Vanderbilt University and fill vacancies in the same now be exercised, and hereafter at its discretion; and it being ascertained that vacancies now exist in the Board of Trust of said university, the following named members of the Methodist Episcopal

Church, South, are hereby elected to fill said vacancies, namely: ———.

"Resolved, third, that following this election the General Conference will, for the future, continue the method of choosing the trustees adopted by the General Conference held at Baltimore in 1898, when it committed 'to the General Board of Education the confirmation of all trustees elected by the Board of Trust of Vanderbilt University.'

"Resolved, fourth, that the General Conference approves the action of the bishops in entering upon the discharge of their duties as visitors of the university."

In pursuance to said second resolution, it elected the relators, V. A. Godbey, N. E. Harris, and Albert W. Biggs as trustees, and ordered their election certified to the board. At the next meeting of the Board of Trust in June, 1910, said parties, so elected, applied to be admitted as members; but the board refused their application, and resolved, by a vote of 19 to 8, that the General Conference had no right to elect members to fill vacancies in the board, that the board itself had that right, that it amend its by-laws accordingly, and proceed to fill the existing vacancies. Therefore it elected for that purpose, and seated, the defendants, Claude Waller, R. F. Jackson, and Jas. A. Robbins, instead of the persons elected thereto by the General Conference. Afterwards, on July 12, 1910, the College of Bishops met as visitors of the university, vetoed this action of the board, declaring it illegal, null, and void, and sustained the right of the General Conference to

elect, and of its appointees to membership in the board.
Thereupon this bill was filed by the State, at the rela-
tion of the College of Bishops and Messrs. Godbey,
Harris, and Biggs, against the University, the Board
of Trust, and Messrs. Waller, Jackson, and Robbins,
seeking to establish and enforce the alleged rights of
the relators, as hereinbefore indicated.        •

The controversies in this case are not so much of
fact as of proper construction of documents and writ-
ten records of various kinds offered in evidence, and
of questions of law arising thereon.  We will now
pass to a consideration and decision of these questions.

The University was incorporated under the Acts of
1871, ch. 54.  Section 1 thereof provides: "Hereafter,
when persons in this State shall desire to be incor-
porated with the powers and privileges of a corporate
body, they shall file a petition in the chancery court of
the county in which the largest number of petitioners
reside, setting forth the purposes and objects of the
corporation prayed for."  Then, after prescribing the
publication required to be made, the court is directed
to proceed to an *ex parte* hearing of the petition, and
"it appearing to the court that the objects of the cor-
poration prayed for are not in conflict with the laws
of the land, nor detrimental to public interests or
morals, the court shall so adjudicate and decree,
. . . and, shall enumerate such usual powers and
privileges of corporate bodies as may be necessary
to carry out the legitimate objects of said corporation."
Section 9 thereof provides: "That the powers granted

to chancery courts by this act, shall extend to the incorporation of institutions of learning, churches, religious and charitable institutions; and the powers and the privileges of such corporations shall. be as prescribed in sections 1470, 1471, 1472, and 1473, of the Code of Tennessee.''

Code, sec. 1470, applies to corporations with stockholders.

Section 1471 provides: ''If the members are not interested as stockholders, each member is entitled to vote at all elections one vote, and to bear an equal voice in all the deliberations of the whole body. Such members may fix the number of trustees, the officers of the association, their terms of service, and compensation.''

Section 1472: ''Corporations created under this article may hold real and personal property not exceeding in value $50,000, may receive property by gift, will, or devise, holding the same for purposes of their incorporation, with all the lawful conditions imposed by the donor, and may exercise such powers as are incident to private corporations.''

Section 1473 provides for service of process on the corporation in case of suits, etc.

The Code of 1858, from which these sections are taken, had provided for the organization of corporations of various kinds by proceedings quite different from those provided by the. act in question. The Constitution of 1870 had forbidden the granting of charters by special act, and required that all charters of cor-

porations should be granted by general laws. In pursuance to this provision of the Constitution, the Legislature of 1870-71 passed the act in question as a general corporation act, providing for the organization of various kinds of corporations. We have quoted so much thereof as is appliable to the class of corporations to which this educational institution belongs. This is a general act, covering the whole subject, and therefore superseded the Code provisions except so far as they were adopted and re-enacted thereby. *Terrell* v. *State,* 86 Tenn., 523, 8 S. W., 212; *Malone* v. *Williams,* 118 Tenn., 445, 103 S. W., 798, 121 Am. St. Rep. 1002.

It changed entirely the method of procedure necessary to obtain a charter and organize a corporation, but as to institutions of learning, etc., section 9 of the act gave them the same powers as were given to like corporations organized under the Code. *Heck* v. *McEwen,* 12 Lea, 97; *Ex parte Chadwell,* 3 Baxt., 98.

Whether that act would authorize representative incorporation, that is to say, the incorporation of a certain body or class of individuals as an educational institution upon the application of a few acting as their representatives, it is not necessary in this case to decide, for the reason that the applicants for this charter had not been authorized to represent for that purpose any one other than themselves, unless, perchance, it were the members of the Memphis convention by whom they had been named. The members of that convention formed a mere temporary body, with-

out permanence or succession, and clearly they did not contemplate their own incorporation. The insistence in this case is not to this effect, but that they represented the annual conferences, whose committees constituted that convention. We cannot agree with this contention, for several reasons. The conferences had not authorized that convention to bind them, and the convention did not undertake to do so. The conferences, whether incorporated or mere voluntary associations, were not competent to form an association with each other for the purpose of incorporation, or, without express statutory authority, to act as members of a corporation. 1 Thomp. Corp. (2d Ed.), sec. 176; 1 Wilgus, Corp., 56, 553; 1 Clark & Marsh. Corp., p. 127; 1 Meacham, sec. 130. See, also, *Mallory* v. *Oil Works,* 86 Tenn., 598, 8 S. W., 396; *Rhodes* v. *Rhodes,* 88 Tenn., 637, 13 S. W., 590; *Green* v. *Allen,* 5 Humph., 158.

The Tennessee act in question clearly contemplates the incorporation of natural persons, and not corporations or voluntary associations. These annual conferences, whether incorporated or not, were representative bodies composed of delegates from the several churches within their bounds, and the churches were composed of individual members. It has been suggested that, if the conferences could not act as incorporators, the delegates of whom they were composed might do so; but it is clear that they had no such intention, or that the individual members of the several churches could do so. It is equally clear that they had no such intention. The Memphis convention

and its Board of Trust entertained no such thought. This would be carrying representative incorporation beyond the limit. If such were permissible, a large class of persons who had never even dreamed of the subject, might wake up and find themselves incorporated. The act provides only for persons so desiring to be incorporated.

The subsequent ratification of the action of the convention, and the Board of Trust, could not change the result, for the action taken did not purport to incorporate any but the petitioners, and the by-law adopted in furtherance of the Memphis Resolutions proclaimed that "the charter leaves the perpetuity of the board in its own power," and requested the several conferences co-operating to nominate four members for election, etc. This was certified, along with the charter and the Memphis Resolutions, to the conferences, and when they ratified they could not possibly have understood that they thereby became incorporators, and such ratification could not, in any event, change the legal effect of the charter already granted. Moreover, the petition for the charter was filed by the applicants as individuals, and not as representatives of any one, and the publication thereon was made accordingly. The fact that they are described in the decree or charter as representatives of certain annual conferences does not in this respect change the result. While the court in pronouncing this decree was acting not judicially, but ministerially (*Ex parte Chadwell,* 3 Baxt., 108), yet the proceeding was according to judicial forms, and

the decree, or charter, cannot depart in substance from the petition. The petition is the basis and measure of the thing to be granted. The court might grant less, but not more, than was sought by the petition. *Wilson* v. *Schaefer*, 107 Tenn., 300, 64 S. W., 208; *Gilbreath* v. *Gilliland*, 95 Tenn., 383, 32 S. W., 250.

Therefore we are of opinion that, under this act and these proceedings, the persons applying for the charter became the incorporators, the body politic or corporate, in other words, the members of the corporation; and had the right of perpetual succession. Neither the act, nor the charter, provides how their successors shall be chosen, and, in the absence of such provision, in the case of a corporation aggregate, that right, by necessary implication, would be vested in the persons so incorporated. 1 Blackst. Com., 475-576; Taylor on Corp., sec. 14; Kyd on Corp., 69; Ang. & Ames on Corp., 70, 89; Fowler on Charitable Uses, 138, note 3.

Such, indeed, for a period of thirty-five years or more after the organization of this corporation, was the uniform construction of its charter by all parties concerned.

It is to be observed that many members of the Board of Trust from its inception have been eminent lawyers, not only of Tennessee, but also of other states.

The practical interpretation of a contract by the parties thereto is entitled to great, if not controlling, influence. *Chicago* v. *Sheldon*, 9 Wall., 54, 19 L. Ed., 594.

There is great contention in this case as to the effect of the Memphis Resolutions, which are embodied in this charter. Complainants insist that they constitute the essence, or soul, of the charter, and the defendants that they are mere surplusage, and of no effect whatever. It seems that, throughout the history of this institution, much doubt on this question has arisen in the minds of the Board of Trust, and other parties concerned, and to settle that doubt more than one effort was made to eliminate them from the charter; and it is now contended by the defendants that this was in fact done by the amended charter of 1873. We do not regard it as very material whether they became technically a part of the charter or not. At any rate, they were not improperly incorporated therein. The Acts of 1871, ch. 54, requires, among other things, that the petition shall set forth the purposes and objects of the corporation prayed for, to the end that the court may adjudge and decree that the objects of the corporation are not in conflict with the laws of the land, etc. The objects of this corporation, as stated in the petition, were "for the purpose of soliciting subscriptions [and] donations, and for the erection and maintenance of an institution of learning of the highest order, maintaining all the schools belonging to a university of that character, together with the rights, powers and privileges which, by law, may belong to literary institutions chartered by the laws of the State." It was altogether proper for the court under this petition to inquire into, find, and insert

into the decree the objects and purposes of this corpora-·
tion, not merely in the general terms of the petition, but
the more amplified and particular form as stated
in these Memphis Resolutions, which constitute the
plan and specifications upon which this institution was
to be built, and then, as directed by the statute, "enu-
merate such usual powers and privileges of corporate
bodies as may be necessary to carry out the legitimate
objects of said corporation," and so the court did in
this charter.

Mr. Thompson, in his work on Corporations, says:
"The statute of perhaps every State in the country
authorizing the organization of corporations requires
the articles to state definitely and clearly the objects
and purposes of the proposed corporation. This is
regarded in some respects as the most important re-
quirement, for by this the powers of the corporation
are to be determined, and its acts, to be legal and bind-
ing, except as otherwise hereinafter shown, must be
measured by the objects and purposes stated." 1
Thomp. Corp. (2d Ed.), sec. 191. See, also, Id., sec.
40.

We are of opinion that the Memphis Resolutions
were not eliminated from the charter by the amend-
ment thereto of 1873.

The petition asked, not for a new charter, but for
certain specific amendments to the existing charter.
The decree shows that only two of these were allowed,
to wit, the change of name and the power to increase
or diminish the number of members of the board.

Nothing is said of the others. However, the decree passes to Vanderbilt University all rights, powers, privileges, immunities, and franchises "which heretofore by law under the decree of this court were conferred upon said corporation" under its former name and style, and so seems to confirm, rather than eliminate, the provisions of the original charter in regard to the Memphis Resolutions. But whether they had ever been incorporated in the charter or not, or whether they had been eliminated therefrom by this decree of 1873 or not, we think they would still constitute, in so far as their provisions are legal, the underlying plan of this institution, and their character and effect would, in either event, be the same, to wit, its so-called "Articles of Foundation."

This leads up to the much discussed question as to who is the founder of this institution.

The Memphis convention, composed of delegates from the several annual conferences, without power, however, to bind them by its action, was the original designer, architect, as it were, of this educational enterprise. It devised and formulated the general plans and specifications, or so-called "Articles of Foundation," upon which it was to be built. It named a Board of Trust, who should procure an act of incorporation, in order to give it permanence and carry out the founder's intention with more convenience. 2 Perry on Trusts, sec. 742; *Dartmouth College Case,* 4 Wheat., 574, 4 L. Ed., 629; *Atty. Gen.* v. *Pierce,* 2 Atk., 87; Tudor on Charities, sec. 63; *Nelson* v. *Cushing,* 2 Cush.

(Mass.), 527; *State v. Toledo,* 23 Ohio Cir. Ct. R., 327.

It also authorized and enjoined on this Board of Trust when so incorporated to seek and, if possible, find a founder or builder who would supply the necessary funds to accomplish its objects. It had prescribed a million dollars as the amount desired, and a half million dollars as the minimum amount upon which it could be founded or begun.

In pursuance to this authority and injunction, the Board of Trust at first sought this founder and funds necessary to its projects among the co-operating annual conferences and the members of the Methodist Episcopal Church, South. In this effort they succeeded in raising but a fraction of the minimum amount required, and that fraction rested only in promises. Possibly those promises, or subscriptions, were not binding, or, in law, collectible, until the minimum required had been procured. They had about despaired of success from this source when Mr. Vanderbilt made his first donation of not less than half a million dollars, the full minimum required, and directly afterwards doubled the amount, thus making the full endowment called for by said Memphis Resolutions.

With these funds so donated by Mr. Vanderbilt, and a comparatively small amount contributed by citizens of Nashville in order to secure a particular location of the institution, the Board of Trust provided a campus, buildings, outfit, and endowment for the university. Such amounts as they realized from antecedent subscriptions were subsequently devoted to the so-

called "sustentation fund," for defraying personal expenses of students attending the theological department of the university.

Then, so far as money was concerned, it was Mr. Vanderbilt, and not the church, who breathed the breath of life into this corporate body, if not dead, at least until then inert and powerless. Hence on this issue we find that Mr. Vanderbilt, and not the annual conferences or the church, was the founder and original patron of this institution.

Nevertheless, in so far as their provisions are valid and legal, he founded the institution upon the plans and specifications, or so-called "Articles of Foundation," contained in the Memphis Resolutions, except so far as he saw fit to append other legal conditions to his gifts. He did impose on these gifts some conditions which modified to some extent these Memphis Resolutions, the chief of which was that Bishop McTyeire, through whom the gift was communicated to the corporation, should be made president for life, at a fixed salary, and the use of a dwelling house free of rent; that as such president he (and possibly his successors in office) should have a veto power over the acts of the Board of Trust, the legality and validity of which is open to very serious question, and that the university should be located in or near Nashville. It will thus be seen that they did not supplant the main body of the Memphis Resolutions, but were ingrafted thereon.

Whether the seventh and ninth of these resolutions do not attempt an unwarrantable and illegal interfer-

ence with the normal and legitimate powers of a Tennessee corporation and its governing body of directors, or trustees, presents a very serious question, but is not in issue here, and for that reason is not discussed and decided.

The petitioners for this charter were incorporated as a Board of Trust, or trustees. Trustees for what purposes and trust? Originally, to administer this charity as planned by the Memphis convention, or, in the language of the resolutions, for "the carrying out of this whole scheme . . . with power to solicit and invest funds . . . and do whatever is necessary for the execution of this scheme." This trust was recognized by incorporating in the charter these resolutions in full, also by describing therein the petitioners or Board of Trust as representatives of the several annual conferences from which they came. The law, as well as their charter, imposed upon them the further trust of holding such real estate and personal property as they may receive by contract, gift, will, or devise "for the purposes of said corporation, with all the lawful conditions imposed by the donor."

A charitable corporation is in itself a trustee, and its charter constitutes a declaration of trust. 2 Morawetz on Corp., sec. 1046, cited in *Church* v. *Hinton,* 92 Tenn., 188, 21 S. W., 321, 19 L. R. A., 289.

In Perry on Trusts, cited above, it is said: "The trustees of a charity frequently procure an act of incorporation in order to carry out the intention of their donor with more convenience."

In *Nelson* v. *Cushing,* supra, where trustees appointed by will for the establishment of a free school had become incorporated, the court said: "This act, in our judgment, does not vary the powers or the duties of the trustees, or change the character of the school placed under their management. It enables them to act in a corporate name, and to have a corporate seal; and it affords them the facility of taking conveyances, obligations, and securities, in their corporate name, and avoids the necessity of changing such securities upon a change of individual members composing the board."

In *State* v. *Toledo,* supra, a corporation had been formed for the purpose of carrying out a trust founded by one Scott, and the court held that "a person establishing an institution of learning of such a character and for such purposes as he deems proper, and such as he deems useful and beneficial to his fellowmen, has a right to place such restrictions or conditions upon the trust which he creates as he sees fit; and the act of incorporation, while made under general laws, for the purposes of carrying out the trust, is subordinate and subsidiary to such trust. The purposes and objects of the donation must govern the institution, unless by some act of those who have power over the fund some change is made. The legislature has no independent power to change or alter the trust."

This brings us to the consideration of the eighth of the Memphis Resolutions. We find in it nothing that contravenes the express provisions, or policy, of the law. It is in furtherance of the general objects and

purposes of.this corporation, as expressed in its charter and the petition therefor.

Then what was the effect upon the constitution of the Board of Trust, of this eighth of the Memphis Resolutions? "That provision be made in the charter for giving a fair representation in the management of the university to any annual conference hereafter co-operating with us." With us? With whom? Not the annual conferences from whom the delegates came, for they were not bound by the convention's action, and might not, any or all, co-operate in this enterprise. Therefore "with us" means primarily the convention, who was speaking, and ultimately the Board of Trust—the corporation, the university itself, the sole survivor and heir of that convention. What "annual conferences hereafter co-operating with us?" Not merely those which were not then represented in the convention, but any annual conference, whether there represented or not, which ratified the action of the convention and thereafter would co-operate with the Board of Trust in the "carrying out of this whole scheme." This, then, calls for giving "a fair representation in the management of the university to any [and all] conferences hereafter co-operating," thereby recognizing that none were at the present time bound to do so.

This scheme was not conditioned upon the ratification of the conferences. The very first resolution was to the effect "that measures be adopted looking to the establishment, as speedily as practicable, of an insti-

129 Tenn.—22

tution of learning," etc.; and the sixth provided "that the carrying out of this whole scheme is hereby committed to the following persons," to wit, the Board of Trust named, "who shall take immediate steps" to carry it out; and this eighth resolution does not contemplate ownership of the intsitution by the conferences, but merely co-operation by them "with us"— the Board of Trust—the university itself, and in return for such co-operation each conference should have a fair representation in the management of the university; that is to say, on the Board of Trust. The second resolution, "that the institution shall be called the Central University of the Methodist Episcopal Church, South," does not necessarily mean ownership of the university by the church. If it stood alone, it might imply as much; but, in connection with the other resolutions, it is intended merely to define the character of the institution, and invite the affiliation and influence of the church. Such, too, was the purpose of the fifth resolution as to its location by the bishops, and the ninth, as to the relation of the bishops to the university. The effect of the latter resolution will be hereinafter more fully noticed in connection with another matter. The charter expressly provided that the Board of Trust "shall make all by-laws necessary and proper to carry out said resolutions." The board properly construed this "fair representation" to mean equal representation, and originally provided for it by by-law No. 2, allowing to each conference four members of the board. The number was subsequently re-

duced, first to two, and finally to one, from each. Originally they provided that the conferences should name their representatives and the board would elect. Then, for very good reasons, wisely suggested by Bishop McTyeire, they reversed this rule, and provided that the board should elect subject to confirmation by the conferences. They excluded members from conferences, represented in the Memphis convention and the charter, but failing afterwards to ratify and co-operate. One such conference subsequently approved and named representatives, who were then admitted to membership. They also admitted members from one co-operating conference not represented in the convention and charter. They reduced the terms of members from life to eight years. At first, the whole board was made up of representatives of the several conferences. Then, as these representative members were reduced in number, others were admitted who did not represent and were not named or confirmed by the conferences. All of these changes were originated and made by the board, but most of them, at least the more radical ones, affecting the representation of the conferences, were submitted to and approved by the conferences. This arrangement from the first was referred to by the conferences as a contract, and usually by the board as a by-law relation between the parties. We think both were right, and that it amounted, in fact, to a trust relation between them. The relation, both by the Memphis Resolutions, and the practical interpretation thereof by the parties, was not that of ownership by

the conferences, but of co-operation with the university and fair representation in its management. What this fair representation should be, considering the best interests of the university, was from time to time settled and fixed by mutual agreement. Neither party was at liberty to violate these agreements.

Finally, in 1898, this relation between the annual conferences and the university was by mutual consent terminated, and the General Conference of the whole church was substituted to the rights and privileges theretofore enjoyed by the annual conferences. It was agreed between the General Conference and the Board of Trust that the board should elect and the General Conference confirm all members of the board. This arrangement was entirely consonant with the original plans and purpose of the corporation, and with the Memphis Resolutions. It was merely an acknowledgment of the underlying principle that the church should co-operate with the university and have fair representation in its management. In this way, this relation was to be extended from a part of the annual conferences, theretofore co-operating, to the General Conference, composed of delegates from and having jurisdiction over all annual conferences and the church at large. The by-laws of the university and the practice of the parties were conformed to that agreement until 1910, when this controversy arose. Then both parties, the General Conference first, and the board afterwards, undertook to repudiate that arrangement without consent of the other, and each asserted the right to elect

members independently of the other.  Unless controlled by Act of 1895, ch. 6, hereafter to be noticed, that agreement could no more be ignored or violated by the parties thereto than those formerly existing between the annual conferences and the university.

The power of this corporation to enter into such agreements and pass such by-laws appears to be expressly given by the charter; but, if not, it is so consistent with the charter and its declared purposes and objects that it may well be implied. 3 Thompson on Corp. (2d Ed.), secs. 2108-2112. In section 2112 it is said: "When an express power is granted to do a particular act, or to engage in a stated business, this carries with it by implication the right to do every act which may be found reasonably necessary to give effect to the power expressly granted. On this principle every corporation, at least in the absence of restrictive language, possesses the powers found necessary, not only to its existence and self-preservation, but, as already said, to powers expressly granted, or to effectuate the purposes and objects of the incorporation."

The by-laws of a corporation must be consistent with the spirit and terms of the corporate charter, and when such a by-law is adopted it becomes, while in force, as much a part of the law of the corporation as though its provisions had been a part of the charter. When a by-law enters into a compact between the corporation and its shareholders, it is in the nature of a contract between them, and is not revocable to the prejudice of the shareholder. So, too, a by-law of a

nonstockholding corporation which enters into or constitutes a contract or declaration of trust between that corporation and its beneficiaries, cannot be repealed, so as to deprive the parties of their rights under such contract or declaration of trust. See 5 Am. & Eng. Enc. Law (2d Ed.), 88, 91, 95; *Kent* v. *Quicksilver Mining Co.,* 78 N. Y., 179; 1 Thomp. Corp., sec. 1017; *Matthews* v. *Associated Press,* 136 N. Y., 333, 32 N. E. 981, 32 Am. St. Rep. 741; 1 Cook, Corp., sec. 4a and notes.

We will next inquire into the effect and operation of the ninth of the Memphis Resolutions: "That the bishops of the Methodist Episcopal Church, South, be and are hereby requested to act as a Board of Supervision of the University or any of its departments, and, jointly with the Board of Trust, to elect officers and professors, and prescribe the course of study and a plan of government."

It is claimed by complainants that this vested in the College of Bishops the common-law right of visitors over this corporation. At common law, this visitorial power was a property right, belonging to the first donor and founder of a charity, and arose by implication from the gift, or it might be vested by him in his appointee. There is no claim in this case that the bishops were donors to and founders of this charity, and hence no such right can arise on that ground; but it is said that they were appointed by the founder to be the visitors. As we have already said, the founder of this charity, by gift of its endowment, was Mr. C. Vander-

bilt, and he did not appoint the College of Bishops visitors. If he appointed any visitor, it was a limited appointment of Bishop McTyeire (and possibly his successor in office), who was, as a condition of his gift, made president of the board for life, with veto power over its action. Whether this was a lawful condition, or an unwarranted interference with the power and authority of the directors of a Tennessee corporation, it is not necessary in this case to inquire or decide. The condition was made, and complied with, and, by the death of Bishop McTyeire, has been treated as terminated. Whether this is so is not in issue here.

But it is insisted that, by providing the plan or "Articles of Foundation," the Memphis convention or the Methodist Church founded this institution, and by this ninth resolution appointed the bishops visitors, and it may be asserted that Mr. Vanderbilt, as founder, adopted this appointment, if such it was. Let us inquire into the meaning and effect of this resolution. As to what, if any, relation other than that of visitors, it created between the College of Bishops and the corporation, it is not necessary to decide, as no issue of that kind is made in this case. Hence we limit the inquiry to the question as to whether it vested in the College of Bishops this common-law visitorial power.

By Private Acts 1857-58, ch. 32, certain persons named were granted a charter and incorporated under the name and style of "The Board of Trustees of Central University of the General Conference of the Methodist Episcopal Church, South." Several of those

named therein as incorporators were also members of the Memphis convention, and it is asserted by both parties to this case, and seems altogether probable, that the committee of that convention who drafted its resolutions had before it as a precedent this act of 1857-58. Section 2 thereof provides "that the General Conference of the Methodist Episcopal Church, South, shall have supervision over the above incorporated Board of Trustees; they shall have and possess power of visitation, and also power to fill vacancies in the board by death, resignation or removal."

A comparison thereof with this ninth resolution is significant, in that both provide for "supervision" of the corporation, while the former confers the additional power of "visitation" and "to fill vacancies in the board," and the latter omits both.

The act of 1857-58 thus makes a decided distinction between the power of "supervision" and of "visitation."

That the Memphis Resolutions adopted the one and rejected the other can mean nothing less than an intention not to give the power of "visitation." Moreover, we think the power of "supervision" is not equivalent to and does not necessarily include that of "visitation." The latter was probably omitted for the very good reason that it was not pertinent to the corporation contemplated by the Memphis Resolutions. At common law, the right of visitation vests only where the persons interested in the charity were themselves incorporated, and not where disinterested trustees were

appointed and incorporated to administer the trust for the beneficiaries.

In the leading case on this subject it is said by Lord Holt:

"For it is fit the members, that are endowed and that have the charity bestowed upon them, should not be left to themselves (for divisions and contests will arise amongst them about the dividend of the charity), but pursue the intent and design of him that bestowed it upon them."

"Now, indeed, where the poor or those that receive the charity are not incorporated, but there are certain trustees who dispose of the charity according to the case in 10 Coke, there is no visitor; because the interest of the revenue is not vested in the poor that have the benefit of the charity, but they are subject to the orders and direction of the trustees. But where they who are to enjoy the benefit of the charity are incorporated, then, to prevent all perverting of the charity, or to compose differences that may happen among them, there is by law a visitorial power."

*Phillips* v. *Bury,* 2 Term. R., 352.

In *Green* v. *Rutherford,* 1 Ves. Sen., 471, Lord Hardwicke said: "If the charity is not vested in the persons who are to partake, but in the trustees for their benefit, no visitor can arise by implication."

A like rule is recognized in the *Dartmouth College Case,* 4 Wheat., 563, 565, 566, 645, 675, 676, 4 L. Ed. 629; *Allen* v. *McKean,* 1 Sumn. 276 Fed. Cas. No. 229; *Sanderson* v. *White,* 18 Pick. (Mass.) 328, 29 Am. Dec. 591.

In 2 Kent's Commentaries (13th Ed.) 300, it is said: "Where governors, or trustees, are appointed by a charter, according to the will of the founder, to manage a charity (as is usually the case in colleges and hospitals), the visitorial power is deemed to belong to the trustees in their corporate capacity."

There is yet another reason why we think the visitorial power did not vest in the College of Bishops. This ninth resolution did not appoint the bishops to anything, but merely requested them to act as a Board of Supervision, etc. Soon after the convention adjourned, the Board of Trust communicated this resolution, together with the fifth, in regard to locating the university, to the College of Bishops then in session, "with the view of obtaining an acceptance of the foregoing official relation to the university." The bishops first considered a motion to decline the request outright, but on second thought resolved: First, that they would locate the institution when the $500,000 shall be pledged for the enterprise. Second, "that by this act we are not to be understood as implying that the said institution is to be considered connectional to the damage of existing colleges and universities. We can take no official relation to the Central University that will discriminate between it and any and every other institution of the church. Nevertheless, we feel free to give our decided approval to the combination of the several annual conferences represented in the convention in Memphis, or so many of them as may agree together, acting through their respective bodies, in get-

ting up an institution of the highest grade.'' And, third, withholding any opinion upon the subject of a theological department, about which there was grave controversy among the churchmen. It does not appear that the bishops had any official relation to any other educational institution of the church, so that their acceptance in this case would apparently operate as a discrimination in its favor. The board (as do we also) construed this answer of the bishops as a declination of all official relations with the university contemplated by that ninth resolution. This is manifest from their reference to the bishops' conditional promise to locate the university and their significant silence as to what the bishops say about assuming no official relations to the institution.

After Mr. Vanderbilt had endowed the university, and the board by means of his gifts had established it, the bishops seem to be ready and willing to adopt the enterprise. All parties seemed to be in doubt about what relation they bore to the institution. They assumed and exercised very uncertain and fitful rights and privileges. After a time the board resolved to admit them as members *ex officio,* and later rescinded that action and elected five of their number to active membership. Not until after the so-called Vanderbilt Commission had reported that they had no right to membership in the board, but that they held the right of visitation, were they heard to claim such a right, or did they attempt to exercise it; and this was nearly forty years after the charter was granted to the uni-

versity, and after they had in the outset declined all official relations to the corporation. If there ever had been any merit in the claim, we think they had long since abandoned it, and were then estopped to assert it.

Whether this resolution invests them with legal power of any kind we very much doubt; but, as hereinbefore stated, the alleged visitorial power is all that is here in issue, and for that reason we limit our decision to that point.

We turn now to the consideration of the Act of 1895, ch. 6, entitled ''An act for the benefit of incorporated educational institutions.''

Section 1 empowers such institutions to acquire, receive, and hold property for educational purposes, without limit of amount.

Section 2 provides: ''That wherever any such educational institution has been established, and is being maintained and patronized by, or having been otherwise established, is now being maintained and patronized by any religious society or denomination, or shall hereafter be so established, maintained and patronized, the representative governing body of such society or denomination shall have the power and authority as its option, to elect its board of directors or trustees, or fill vacancies occuring therein, and, with the consent of such boards, to increase or diminish the number of members thereof, as may seem to such body best for the welfare and judicious management of the institution; provided, that in case such governing body shall fail

or refuse to exercise the power given herein, then the vacancies shall be filled as now provided by law.''

Section 3 authorizes the consolidation of two or more such institutions.

Complainants claim that section 2 of this act authorizes and empowers the General Conference of the Methodist Episcopal Church, South, at its option to elect the Board of Trust or fill vacancies therein of Vanderbilt University.  The defendants upon several grounds deny this claim.  They say that this act violates article 2, sec. 17, of the state constitution, which provides that ''no bill shall become a law which embraces more than one subject, that subject to be expressed in the title.''

They further say that the title to this act is so vague and indefinite that it does not express or indicate the subject, and that the act itself contains three distinct subjects, and hence is void.  If this were an open question, the writer of this opinion would regard it as very serious, but in the case of *State ex rel. Dobson* v. *Washington & Tusculum College* (Mss., Knoxville, September Term, 1912), involving the validity or invalidity of an attempted consolidation of two incorporated educational institutions under section 3 of this act, the same attack was made on its constitutionality, and the court, by a majority opinion, sustained the act.

It is now said in argument that the case was decided on another question, rendering it unnecessary to pass on the validity of this act, but that the court did hold

the title sufficient, and that the point that the act con-
tained more than one subject was not raised, discussed,
or passed upon, and therefore is yet an open question.

It is true that the case turned principally upon an-
other question, but the decision of this question was
not an improper or unnecessary one in the case. The
discussion of this act in the opinion is rather meager,
but the court states, not only the title, but also the sub-
stance, of the act. It says its constitutionality is at-
tacked upon several grounds. It then refers particu-
larly to the question raised on the title, and the sub-
ject expressed therein, and says: "The majority of
the court is of the opinion that the caption of the stat-
ute in question does sufficiently express the subject
of the legislation, and that therefore complainant's con-
tention must be overruled. The authorities upon which
the majority rest their decision on this subject are
*State* v. *Yardley,* 95 Tenn., 516, 32 S. W., 481, 34 L. R.
A. 656, *State* v. *Brown,* 103 Tenn., 450, 53 S. W., 727,
*Furnace Company* v. *Railroad,* 113 Tenn., 728, 87 S. W.,
1016, *Scott* v. *Marley,* 124 Tenn., 390, 137 S. W., 492,
and other cases in these cited and referred to."

It is only fair to presume that both questions here
made were there made by counsel in that case and con-
sidered by the court, although the second point is not
particularly discussed by the court. The one almost
necessarily involved the other. Then we think that if
the title to this act is sufficient, as was distinctly held
in that case, it is general enough to include all the pro-
visions of this act. In *State* v. *Yardley,* supra, this

court has said: ''Generality of title is not objectionable, so long as it is not made to cover legislation incongruous in itself, or which by fair intendment may not be considered as having a necessary or proper connection with the subject expressed''—citing authorities.

We therefore think that this objection to the act is precluded by these authorities, and we overrule it.

Defendants also contend that this university does not come within the purview of this statute. That is to say, that it had not been established and was not being maintained and patronized by, or having been otherwise established, was not being maintained and patronized by, any religious society or denomination (particularly, the Methodist Episcopal Church, South), within the meaning of this act, at the time of its passage or thereafter, and particularly at the time the General Conference undertook to elect its trustees, and hence it was not subject to the operation of this act.

The most significant terms of this act are defined by the Standard Dictionary as follows:

''Establish''—''To settle or fix firmly; place on a permanent footing; settle securely, as in a business; found.''

''Maintain''—''To support; to supply with means of support; provide for; sustain; keep up.''

''Patronize''—''To act as a patron; extend patronage; lend countenance; encourage; favor.''

''Patron''—''One who protects, countenances, or supports some person or thing; one who habitually ex-

tends material assistance; a regular customer; a protector or benefactor.''

At common law, as applied to charities such as universities, the patron was the founder, the endower.

''*Patronum faciunt dos, aedificatio, fundus* (Black's Law Dictionary); this is to say: Endowment, building, and land make a patron. So, in the leading case of *Phillips* v. *Bury*, 2 Term, R., 346, Lord Holt said: 'It is now admitted on all hands that the founder is patron.' ''

''And again, in the *Dartmouth College Case*, Judge Story said: ''The patron, or endower, is the perficient founder.''

From these various definitions, it will be seen that to establish, to maintain, to patronize, mean, in short, to found and support. Now, did the church establish—found—this University? We have already answered this in the negative.

Has it maintained and patronized it? In the sense of lending countenance, encouragement, and favor, and being a regular customer, it has undoubtedly patronized it. The university has drawn probably half or more of its students from Southern Methodists; but its doors have always been open to all, and many other denominations have in this sense patronized it. If this were sufficient, a number of denominations might set up similar claims under this statute. This is clearly not the maintenance and patronage contemplated by this act.

Has the Methodist Episcopal Church, South, then, maintained and patronized this institution in the more

substantial way and legal meaning of said terms of providing the means of support, founding, endowing, sustaining?

To answer this question, let us again briefly review the facts. The original effort to raise by subscriptions from the conferences and churches and their members the endowment called for and required was an acknowledged failure. Altogether, from first to last, about a hundred thousand dollars of subscriptions, or promises, were had from these sources, of which about fifteen thousand dollars have been realized, and the whole has been devoted to the "sustentation fund," as hereinbefore explained. Outside of the Vanderbilt gifts and Nashville's contributions to the purchase of the campus, and about $23,000 from the same source for rebuilding after destruction by fire of some of the buildings, there has been received at various times from the church, churchmen, and all other cources, excepting tuition and fees of students, about $325,000 for specific purposes, such as endowing certain chairs or professorships, lecture courses, and scholarships, most or all in the theological department, and to enlarge that department, without, however, relieving to any extent the general endowment from allowances made therefrom to that department. Nothing from these sources has been realized and applied to the general endowment and support of the university in any of its other departments. Mr. Cornelius Vanderbilt gave the original endowment of a million dollars and other members of the family subsequently

129 Tenn.—23

added another million, partly to pay expenses, but chiefly to add to the general endowment, and this endowment has provided the blood, bones, and sinews of this body corporate, properly and justly called, after his first gife, "Vanderbilt University."

It is now claimed that the church is entitled to credit for these Vanderbilt gifts. The original endowment was given by Mr. C. Vanderbilt through Bishop McTyeire, without solicitation, to the corporation itself. It was not given to or through the church. Mr. Vanderbilt was not a churchman. At the time of his gift he must have been acquainted with the charter, including the Memphis Resolutions and the by-laws of the University. He made his gifts to the corporation by its corporate name.

In *Carson* v. *Carson*, 115 Tenn., 50, 88 S. W. 178, this court has said: "The devise and bequest being made direct to a corporation which is charitable, the trusts need not be set out so specifically and definitely as if made to individuals, in order to make them valid. The reason is that a corporation organized for charitable purposes has these purposes and trusts set out in its charter and articles of foundation, so that the trusts are thus made certain and will control; due deference being paid to the directions of the testator, if any are given. But no trusts in such case need be declared, as they are set out in the charter and articles of foundation. To illustrate: If a bequest be made to the Vanderbilt University, or Cumberland University, by name, the trust to which the fund is to be applied need not be

further specified by the grantor, since these are well-known charitable corporations, whose objects, purposes and trusts are fully set forth in their charters and other instruments of foundation.''

Hence, subject to the particular conditions imposed by him in his deed of gift, his endowment was impressed by the trusts specified in the charter and by-laws of this institution. He knew that the Board of Trust claimed, and in fact had, the right of selfperpetuation by electing its own members, subject however, to the condition imposed by the by-laws in pursuance of the Memphis Resolutions, to the effect that the conferences co-operating with the university should have a fair representation in its management, to wit, on its Board of Trust, and doubtless relied upon that fact for the proper administration and application of the endowment so provided, subject, of course, to such other legal conditions as he imposed in his deed of gift. The same is doubtless true of the subsequent gifts by other members of his family.

Upon these facts, we hold that the church cannot properly lay claim to the Vanderbilt gifts as coming from it.

From the time of these gifts until this present controversy arose, and the report of the Vanderbilt Commission was made, not only the university and its Board of Trust, but the church at large, its bishops, conferences, and members, recognized Mr. Vanderbilt as the founder, the patron, of this institution. His birthday was early declared to be Founder's Day, and

was ever afterwards celebrated as such. The present claim that the church was the founder first took form, if it did not originate, with the report of the Vanderbilt Commission. We repeat our holding that Mr. Vanderbilt, and not the church, was the true founder and patron of this university, and now further hold that he and his family, by their endowments, have maintained and patronized this institution in the true and proper sense and meaning of those terms, and that therefore this university does not come within the purview and operation of this statute.

There are yet other reasons to support this view. It must be remembered, as we have heretofore held, that this Board of Trust are not only the directors or trustees of this corporation, but also the incorporators themselves. By their charter and the code (section 1471, hereinbefore quoted) they are authorized as members of the corporation to fix the number of trustees, the officers, etc., and under this authority they might have fixed the number of trustees or directors at less than their whole body, but not less than the minimum number required by statute (at present, not less than 5 nor more than 33—Acts 1889, ch., 181; Shannon's Code, sec. 2520); but, as their whole body did not exceed the maximum allowed by law, they all chose to act as directors or trustees. This, however, cannot affect their character as incorporators, nor can they be deprived of any of their rights as such by dealing with them as directors or trustees. This act deals only with the

election of directors or trustees, and not members of the corporation.

It was not intended to apply to corporations like this, but rather to such as are organized under Acts 1875, ch. 142, sec. 2 (or similiar acts), which provides: "If said corporation is organized as a literary or educational institution, under the patronage of any Christian or Jewish denomination, the corporation shall have the power to increase the number of directors or trustees; to regulate the mode and manner of appointments of the same, on expiration of terms of service; to regulate the number, duties and manner of election of officers, either actual or *ex officio*; to appoint executive agencies, and to pass all other by-laws, for the government of said institution as may be required by the denomination establishing the same: Provided, said by-laws are not inconsistent with the Constitution and laws of this State."

Such was the case of *Southwestern Presbyterian University* v. *Presbyterian Synods of Tennessee,* decided by this court at Nashville March 31, 1905, referred to by complainants as authority for their contentions in this case. In that case the university was chartered under the last act mentioned, and as an institution under the patronage of the Presbyterian Church in the United States, and in pursuance to a certain plan of union entered into by certain synods of that church for the purpose of establishing, maintaining, and patronizing said university. This court, in its decree, decided "that the said university is under the patron-

age of the Presbyterian Church in the United States, and that in this relation of patronage the state synods of Tennessee, Mississippi, Louisiana, and Alabama act for said church, and for it and in such capacity have the right to elect each two directors of the said university corporation, according to the plan of union adopted by the synods originally co-operating in the establishing of said Southwestern Presbyterian University, which provided in substance that the government of the university shall be in the hands of the directorate, consisting of two members from each synod, one elected each year after the first, and that therefore the trustees or directors of the said university have no power or authority to select their successors and perpetuate the said board, regardless of the will and desire of the said synods as hereinbefore stated, and that the trustees and directors are rightfully to be selected or chosen in accordance with the customs and by-laws of said university adopted in pursuance of said plan of union, and in practice before the 21st of June, 1904, when this bill was filed.''

The case seemed to turn more upon the construction of the charter and the plan of union upon which it was based than upon this act of 1895 in question; but the decision might well be supported by that act. The case, however, is not controlling, or, indeed, applicable to the facts in the case at bar. This case at bar would be quite different if the university were chartered under the act of 1875, or if, as contended by complainants' counsel, its charter could be construed so as to make

the annual conferences in the first instance, and after-
wards the General Conference as their sole assignee
and successor, the incorporators of this institution, and
the Board of Trust merely its directors or trustees.
In that event, however, as is well said by defendants'
counsel, they would have no need to appeal to the act
of 1895 for authority to elect members of the board of
directors or trustees.   They would already have that
power, as did the synods in the *Southwestern Presby-
terian University Case,* by virtue of their charter. This
case is more like that of *State ex rel. Duncan* v. *Martin
Female College,* decided by this court at Nashville
February 25, 1888, referred to by both parties as
authority for their respective contentions.   In that case
it appears that the testator, Thomas Martin, in 1870
had bequeathed a fund ''to the officers of the Meth-
odist Episcopal Church, South, established in the town
of Pulaski,'' to be used ''for the purchasing of grounds
and erecting suitable buildings for a female school.''
The officers of the local church met and accepted the
bequest, and in conformity with the procedure pre-
scribed by the Code of 1858, elected trustees to procure
a charter, and a charter was accordingly procured. The
charter, among other provisions, contained the follow-
ing:

''Item 3.   The trustees herein named shall hold their
offices   until   their   places   become   vacant   by   death,
resignation, or removal from the county, or removal
by the board for cause, and any vacancy occurring shall
be filled by the board at a regular meeting from nomina-

tions made by the officers of the said Methodist Epis-
copal Church, South, established at Pulaski; that is to
say, by the present officers and their successors of the
Methodist Episcopal Church, South, now established
at Pulaski, and by whom the present trustees were
elected."

The insistence of the bill in that case was that this
church was under the control of the quarterly confer-
ence and of the Tennessee Annual Conference, and that
this school was for that reason under the same control,
but that the charter as taken out had denied this right.
It also appears that for many years the school was
regularly reported to the Tennessee Conference as a
church school and an endowed institution belonging
to the conference, and its president was "appointed";
that is to say, being a minister of that conference, was
assigned by the conference to that position. The issue
for decision in the case was whether this school cor-
poration was under the control of the church, or,
rather, the Tennessee Annual Conference representing
the church, as an ecclesiastical body. The court de-
cided and decreed "That there is nothing in the will
of Thomas Martin, or in the charter of Martin Female
College, or in the resolutions of the officers of the
Methodist Episcopal Church, South, at Pulaski, invok-
ing and putting said charter into existence, which
requires or contemplates that the female school founded
thereunder should be under the dominion, control, or
direction of the Methodist Episcopal Church, South,
through its annual or quarterly conference, or other-

wise, or under the dominion, control, or direction of any religious denomination or sect whatever; that it was not the object of Thomas Martin by his will to place the school founded thereby under the control of the local officers of the Methodist Episcopal Church, South, at Pulaski, as a church organization and in a church capacity; but said officers were designated as a body of individuals who were to inaugurate such school in conformity with the will of said Thomas Martin by invoking and putting on foot a corporate organization with the proper founding, establishment, and subsequent control and management of said school, which they did in the incorporation of Martin Female College, and that the charter of said college is in conformity with said will and not in conflict with same." See the citation of this case in *Johnson* v. *Johnson,* 92 Tenn., 567, 23 S. W. 114, 22 L. R. A. 179, 36 Am. St. Rep. 104.

This case appears to be authority for the following propositions: That the local officers of the Methodist Episcopal Church, South, at Pulaski, not as a church organization or in a church capacity, but as a body of individuals, were members of this corporation by virtue of their charter and the provisions of the Code under which it was granted, and as such were entitled to name the trustees or directors of the corporation; that the charter proceedings, although had under the Code provisions, which expressly allowed representative incorporation, incorporated them as natural persons, and not the church of which they were officers; and that the court, in order to determine the purpose and plan of

government of the charity, will look to the articles of foundation.

Our view of this matter, to wit, that this statute does not apply to this particular corporation, is reinforced by the common understanding and conduct of all the parties. Notwithstanding the fact that this act was passed in 1895, yet the annual conferences co-operating with the university up to 1898 made no claim of right or power under this statute to elect members of the Board of Trust of Vanderbilt University. In 1898, in the memorial addressed by the Board of Trust to the General Conference, it was said: "By the charter of the university the Board of Trust is vested with the power and obligation to fill its own vacancies; but the election of any member is not valid under the law of the university until said member has been confirmed by the conference which he is designed to represent. Under the new plan the board would be at liberty to select its members without geographical restrictions of any kind, and the General Conference would confirm or reject the appointment."

In accepting the proposal of the university through this memorial, the General Conference resolved "that the General Conference of the M. E. Church, South, hereby accepts the proposed relation and control of the Vanderbilt University, and commits to the General Board of Education the confirmation of all trustees selected by the Board of Trust of Vanderbilt University." It asserted at that time no claim of right under the act in question to elect these trustees, and at no

time subsequent, until after this controversy arose and the Vanderbilt Commission had made its report. Here were twelve years of acquiescence in the former relation existing between the university and the conference, and thereby an acknowledgment and tacit admission that this university did not fall within the provisions of this act of 1895. In fact, at the time this controversy culminated in the election by the General Conference of three members of the board upon the assertion of its exclusive right to do so, this action appears to have been taken, not from a dissatisfaction with the former relation existing between the General Conference and the university, but merely to force and test the issue as to its exclusive right to elect members of the board, for at the same time it adopted a resolution to the effect "that following this election the General Conference will for the future continue the method of choosing the trustees adopted by the General Conference held at Baltimore in 1898, when it committed to the General Board of Education the confirmation of all trustees [elected] by the Board of Trust of Vanderbilt University." This rather indicates that the real quarrel or controversy between these parties was not in fact upon this issue.

Other objections are made by the defendants to this act of 1895, but in the view which we have taken of this case it is not necessary to take further notice thereof.

From the foregoing conclusions, it results that in the opinion of this court the relations maintained by the university with the annual conferences from its birth

to 1898, and afterwards with the General Conference to 1910, were their proper and legal relations under the charter and by-laws of the university and its contracts and agreements with the conferences, and that the General Conference in 1910, when it undertook to elect members of the Board of Trust, was not acting within its rights, and its appointees are not entitled to seats in that board; that the action of the Board of Trust in rescinding its existing by-law and electing members independently of the General Conference was likewise unauthorized, except upon the assumption that the General Conference had surrendered its relation of co-operation with and representation in the Board of Trust. We think that the General Conference did not mean to do this, or to abandon any part or right it had in the management of the university, but was asserting a right to more than it was entitled to.

"If one party to the contract claims, as contract rights, thereunder, more than he is given by the contract, such claim does not, of itself, amount to a renunciation of the contract." 3 Page on Contract, sec. 1439, and cases cited. Of course, at any time, if it should voluntarily surrender or renounce this relation, or contumaciously refuse to confirm members elected, and cease to co-operate with the university, its rights to representation in its Board of Trustees, and in its management, would, as a consequence, cease; and, in that event, the Board of Trust could proceed, independently of the General Conference, to the election of members, to fill vacancies in its own body.

We are further of opinion that the inherent power of the Board of Trust to fill vacancies in its own body authorizes it to elect and install members to fill such vacancies and that such new members are entitled to their seats on the board ad interim, until such time as they may be rejected by the General Conference, or its General Board of Education, acting for it and under its authority. It has the right to keep its membership full, and cannot legally divest itself of that power and duty, except conditionally upon the refusal of the General Conference to confirm its appointees. The rejection of such member, or members, by the General Conference would at once create a vacancy to be again filled by the board, subject to the like condition.

We therefore conclude that the relators, Messrs. Harris, Godbey, and Biggs, are not entitled to membership in the Board of Trust; that the defendants, Waller, Robbins, and Jackson, are entitled to such membership, subject to the action of the General Conference, or its General Board of Education, to whom it has committed the duty of confirming, or rejecting, the members elected by the board; and that they are entitled to act as such members, until such time as they may be rejected by that conference or board. Since their election has not been so rejected, they cannot be ousted under this proceeding from their seats in the Board of Trust. It results, therefore, that the chancellor's decree will be reversed, and the complainants' bill will be dismissed, at their costs.

Let decree be drawn accordingly.

LANSDEN, J. I concur in the result reached, but I do not concur in all of the reasoning of the opinion.