S. M. HUDSON et al., Appellants, v. L. K. COLLIER
et al., Appellees.—348 S. W. (2d) 350.
No. 1.

Western Section at Jackson.    February 2, 1961.

Certiorari Denied by Supreme Court July 26, 1961.

W. H. Fisher and George Roberts, Memphis, for appellants.

John Aycock, Shepherd, Heiskell, Williams, Beal & Wall, William F. Kirsch, Jr., and David G. Williams, Memphis, for appellees.

BEJACH, J. In this cause S. M. Hudson, Mrs. S. M. Hudson, Mrs. J. R. Brooks, Jr., B. R. Branch, A. W. Russ and Virgina Russ, as complainants, brought suit against L. K. Collier, T. F. Fracchia, John W. McCall, Trustee, and Ben F. James, as defendants, praying that Tower Park in the Rugby Estates Land Company's Fifth Addition as shown by Plat recorded in Plat Book VI, page 119, Register's Office, Shelby County, Tennessee, be declared a dedicated park, that deeds obtained by defendants Collier and Fracchia from defendants John W. McCall, Trustee and Ben F. James, purporting to convey said park, be cancelled; that defendants be enjoined from destruction of the natural condition of said Tower Park, and for general relief. Pro confesso judgments were taken against defendants John W. McCall, Trustee, and Ben F. James. The parties will be referred to as complainants and defendants, or called by their respective names. Complainants are all owners of lots in the Rugby Subdivision, having purchased their lots on the basis of said recorded plat, their lots being de-

scribed by lot numbers shown on said plat. Some of the lots owned by complainants adjoin said Tower Park, and all of complainants own lots abutting on or adjacent to one or the other of the two alley shown on said plat, giving access to said Tower Park from Vine Street,— a street shown on the plat of said Fifth Addition of Rugby Estates Land Company. The plat referred to was recorded in 1912, and all of the land involved in this cause was acquired by defendant John W. McCall, Trustee in 1936. All of complainants and defendants Collier and Fracchia hold title, either directly or by mesne conveyances from John W. McCall, Trustee. Mesne conveyances from the Rugby Estates Land Company prior to the acquisition of title by defendant John W. McCall, Trustee, will be enumerated. All of such conveyances refer to the above described plat; and, subsequent to its recording, all conveyances, including those to complainants and defendants Collier and Fracchia, have been made on the basis of said recorded plat. In most, if not all instances, the lots conveyed were referred to and described only by their lot numbers as shown on said recorded plat. Tower Park is a triangular tract of land touched by and surrounded by lots 865, 866, 867, 868, 869, 870, 871, 872, 873, 874, and 875 of said subdivision. Defendants Collier and Fracchia own lots 864, 865 and 890 in said subdivision. Lots 864 and 865 face the Overton Crossing Road and back up to said Tower Park and one of the alleys which connect it with Vine Street. Said defendants' property is used for business purposes. Complainants allege in their bill that Tower Park has been used as a park or common by adjoining lot owners for more than thirty years; but that within the last few years defendants Collier and Fracchia have undertaken to acquire title to said Tower Park by obtaining deeds,

first from defendant Ben F. James, and subsequently from defendant John W. McCall, Trustee. The deed from Ben F. James was a quitclaim deed, which, as is conceded, conveyed no title. The deed from John W. McCall, Trustee, to defendants Collier and Fracchia is called a special warranty deed, but it purports to convey only such interests as the grantor owns or may have.

The plat of the Subdivision, Fifth Addition to Rugby, was filed for registration October 18, 1912. It contains the following adoption and dedication:

"We hereby adopt this plat as a plan of subdivision of the Fifth Add. to Rugby and hereby dedicate the streets and alleys to the public use."

On January 10, 1914, Rugby Estates Land Company, a Tennessee corporation, executed a trust deed to Bank of Commerce to secure an indebtedness to Virginia Trust Company of Richmond, Virginia, conveying in trust a tract of land including that involved in this cause, but excepting from the conveyance, and the lien thereof, a list of enumerated lots which had been sold under contract,—which list specified that the lots so excepted are lots shown by the plat of record in Plat Book VI, page 119, Register's Office of Shelby County, Tennessee. Said trust deed does not except streets and alleys or Tower Park. On March 17, 1919, the Bank of Commerce, Trustee, executed its trustee's deed, after foreclosure, to the Virginia Trust Company, a Virginia corporation, conveying the property, as described in the trust deed of January 10, 1914. By deed of August 1, 1929, the Virginia Trust Company executed its warranty deed conveying the same property to Luke Sewell and Ben F. James, in which deed the following language appears:

"Also, beginning in the east line of Woodland Terrace 210 feet north of Oxford Drive; running thence along the north line of a 50 foot street 129 feet; thence north parallel with Woodland Terrace 140 feet; thence west 129 feet to Woodland Terrace; thence south 140 feet to the beginning. This includes also waterworks system, pumping station, water tower and sewerage system, together with all tools, machinery and appliances pertaining thereto."

"Said first party also quit claims a triangular tract of land indicated as Tower Park on the plat of the Fifth Addition to Rugby, together with the 15 foot strip running from said triangular lot of ground southwestwardly to Vine Street."

The water system is thus described as being in the vicinity of Woodland Terrace and Oxford Drive, which is some distance from Tower Park. No reference is made to Tower Park as being a place for the water tower. Also, the water system is covered by the warranty portion of the deed, whereas Tower Park is conveyed by quitclaim only. The proof shows that the water system was not located on or adjacent to Tower Park. On August 1, 1929, Ben F. James and wife, and Luke Sewell and wife joined in executing a trust deed to Union Planters Title Company, and on the same day, James and wife executed another trust deed to said trustee, in both of which trust deeds, "Tower Park", "as indicated on the plat of the fifth addition to Rugby, together with the 15 foot strip running from said triangular lot of ground southwardly to Vine Street" is specifically included. On March 25, 1930, Luke Sewell and Ben F. James executed a warranty deed to Rugby Hills, Inc., in which said Tower Park is similarly conveyed; and on February 2, 1933, Rugby

Hills, Inc., executed its warranty deed to Virginia Trust Company, similarly conveying "Tower Park". On July 1, 1935, Virginia Trust Company executed its warranty deed to Luke Sewell, which, while warranting other property therein conveyed, merely quitclaims "Tower Park". On the same day, July 1, 1935, Luke Sewell and wife executed a warranty deed to James and Sewell, Inc., conveying the same land conveyed by the Virginia Trust Company, and likewise merely quitclaiming "Tower Park". On October 19, 1936, James and Sewell, Inc., executed a warranty deed to John W. Mc-Call, Trustee, which included the Fifth Addition to Rugby, so described, which deed contains, also, the following language:

"There is also included in this conveyance, but by way of quit claim only, the title thereto not being warranted, all of the grantor's right, title, and interest in and to the streets shown on the above mentioned plats, as follows:

"The 60 foot street known as The Elms; the 90 foot street designated as Rugby Parkway; the unnamed street 70 foot wide and 140 feet in length, adjoining lot 82 of the town of Rugby on the north. Also the triangular tract shown on the plat of the Fifth Addition to the town of Rugby designated as Tower Park bounded by lots 836 to 890, including together with the streets or alleys leading to the same from Vine Street; also the alley or street shown on the plat of the Fifth Addition to the town of Rugby running between Oxford Drive and The Elms along the west side of lots 891 to 895, inclusive, also the 25.5 foot strip, alley or street adjoining lot 81 and 82, on the east excepting, however, the plot of ground

on which is located the well pump, pump house and other equipment owned by the grantors, which is located in or near the intersection of Rugby Parkway and Oxford Drive, it being expressly understood that said ground, well, pump house and other equipment are not conveyed hereby.''

On March 24, 1953, Ben F. James, by quitclaim deed, reciting a consideration of $10, which the proof shows to have been actually $25, conveyed ''all his right, title and interest in and to the following described real estate, to wit, Tower Park of the Rugby Estates Land Company as per plat recorded in Plat Book VI, page 119 of the Register's Office of Shelby County, Tennessee'' to L. K. Collier and T. F. Fracchia; and on October 20, 1957, by an instrument designated ''Special Warranty Deed'' John W. McCall, Trustee, for a recited consideration of $10, conveyed to L. K. Collier and T. F. Fracchia ''all my right, title, claim and interest in and to the property described as follows, to wit: A plat of ground sometimes called 'Tower Park' beginning in the southeast corner of lot 874 Rugby Park survey, and running thence in a northeasterly direction along the west side of lots 872, 873, and 874 of Rugby Park 177.7 feet; thence in a southerly direction along the east line of lots 866, 867, 868 and 869 309.5 feet; thence in an easterly direction 95.4 feet to an alley and proceeding across the alley 65 feet, less the two public alleys entering said plot from Vine Street. Said plot is a part of the Fifth Addition to Rugby Park Subdivision.'' The proof shows that the actual consideration for the McCall deed was $250, and it is under this deed that defendants claim to own the land here in dispute. The James deed, according to the

proof, has been returned, together with the $25 paid for same.

The proof shows that most of the time Tower Park was a wilderness grown up with weeds and grass; but there is proof that part of the time some of the adjoining landowners mowed part, at least, of the grass. There is proof that from time to time children played in the park, that at one time there was a barbecue pit in it, and that complainant Mrs. Hudson had used the park to go from her home to the stores on Overton Crossing Road. The proof shows that Mrs. Hudson had a dog pen in the park, but that after the execution of the deed by McCall to defendants Collier and Fracchia, defendant Collier, accompanied by two policemen, called on Mrs. Hudson and had her remove the dogs, after which defendants Fracchia and Collier destroyed the dog pen. The proof shows that defendants Collier and Fracchia are now using Tower Park, or at least part of it, for piling lumber and other materials thereon. Tower Park has never been assessed for taxes, and no taxes have been paid on it.

The Chancellor ruled that there had been no dedication and acceptance of dedication of Tower Park, that title thereto was in John W. McCall, Trustee, at the time of the execution of his deed to defendants Collier and Fracchia in 1957, and that under that deed they now hold title to the triangular tract known as Tower Park. Complainants' bill was dismissed. Complainants excepted, prayed and have perfected their appeal to this Court.

In this Court complainants, as appellants, have filed nine assignments of error. It will not be necessary to

copy these assignments of error into this opinion, nor to discuss them separately. They complain of specific findings of fact by the Chancellor contrary to the contentions of complainants, and to his rulings of law; but, taken as a whole, they complain adequately of the Chancellor's decree dismissing their bill and denying the relief sought. They seek, by their general appeal, a reversal of that decree at the hands of this Court.

We think the learned trial Chancellor erred in dismissing complainants' bill and in denying to them the relief sought. The principal contention of defendants in support of their claim of ownership under the special warranty deed of John W. McCall, Trustee, is that in the plat placed of record in 1912 by Rugby Estates Land Company, the streets and alleys thereon shown were expressly dedicated, but that no such express dedication was made with reference to Tower Park. Evidently the learned Chancellor adopted this argument; and, accordingly, he decided the case in favor of defendants.

The facts of this case, in our opinion, fall within the general rule stated in 16 Am. Jur.,—Dedication—pages 367-368, Section 23, as follows:

"The doctrine of dedication by plat is frequently connected with the sale of lots shown on the plat. The owner of a tract of land is held to dedicate such portions thereof as are designated for public use on the plat with reference to which he sells lots out of the tract. The sale of even one lot under these circumstances amounts to a dedication. However, a mere survey of land by the owner into lots, squares, streets, etc., without a sale, does not thus result. It has been held that the rule applies also to a case

where, in laying out the village plot and in selling the building lots, the state or municipality acts as the owner and proprietor of the land. The effect of the survey and sale in reference to the streets laid down on the map is the same as if the survey and sale had been made by an individual. This rule applies where there has been a lease instead of a sale of the lots.

"Some jurisdictions hold that merely selling lots, with reference to a map designating streets does not constitute an irrevocable dedication as between the vendor and the public, his act alone being held not sufficient to constitute a dedication. As to lot purchasers, however, the situation may be different."

In the next paragraph, American Jurisprudence says, with reference to interpretation of plats, as follows:

"In the interpretation of maps and plats all doubts as to the intention of the owner are resolved most strongly against him, but the plat should be considered as a whole, and the maker's real intention sought therefrom.

"Sometimes the intention to dedicate is unequivocally indicated, as where parts of a tract are left without subdivision by the original owners and marked on the plat as 'public ground', or as 'not to be occupied with buildings of any description', or as 'public grounds'. Furthermore, where words and markings commonly indicative of a public use are used they will ordinarily be taken as setting apart the area so designated for the benefit of the public, although no boundary is delineated. Hence where the word 'quay' is used on a plat, the ordinary significance will be given thereto as meaning a space of

ground appropriate for public use. Likewise, designation by the owner thereof as a block of land as a 'square' on a recorded town plat sufficiently indicates an intention to dedicate the block to a public use, but is insufficient to designate any particular use to which it is to be devoted. The words 'public square' will also effect a dedication. Where there is nothing on the map to indicate that a park designated thereon is reserved by the owners, *the very term 'park' indicates a dedication to public, rather than a reservation for private, use.* (Emphasis ours.) In municipal affairs, a park is a piece of ground set apart and maintained for public use and laid out in such a way as to afford pleasure to the eye as well as opportunity for open air recreation. *It is as significant of a dedication, and of the use to which the land is dedicated, as is the word 'street' written thereon.* (Emphasis ours.) 16 Am. Jur.—Dedication —Pages 369-370, Sec. 24.

In State ex rel. Kincaid v. Hamilton, 109 Tenn. 276, 70 S. W. 619, a tract of land in an unincorporated area, contemplated to be established as the town of East Cumberland Gap, a tract was platted and laid off as a townsite, showing streets, alleys, etc., and the map of same was placed of record. Some lots were sold with reference to this plat; but the streets and alleys were never accepted by the county or any municipality. Later, when the boom in that area subsided, a trust deed encumbering the tract of land, so platted, was foreclosed. The purchaser at the foreclosure sale undertook to fence in the area and close the streets and alleys shown on the plat. In this case it was held that the purchasers of lots on the basis of this recorded plat were not entitled to have

all of the streets and alleys shown thereon kept open, but were entitled to have the streets, alleys and avenues on which their lots abutted kept open, so as to afford necessary and convenient ingress and egress. The relator in this case had contended that he was entitled to have all of the streets and avenues shown on the plat kept open. In disposing of this contention, the Supreme Court said:

"Elliott, Roads & S. (2d Ed.), sec. 120, is also relied on in support of complainant's contention. The author in the first part of this section announces the well recognized doctrine that those who buy lots abutting on a street laid out on a map or plat have a right to insist upon the opening of said street. He then follows this up with the statement that all who with reference to a general plan disclosed by a map or plat acquire a right in all the public ways designated therein. The learned author must have used the expression 'public ways' to mean ways in which the public had acquired rights by acceptance, user, or otherwise.

"At any rate, the weight of authority is opposed to complainant's contention. The sound rule, it seems to us, is laid down in Jones, Easem., sec. 347, as follows: 'When land is sold by reference to a plan upon which several streets and avenues are laid out, the grantee does not necessarily acquire an easement in all such streets or ways. He acquires an easement in the street or way upon which his lot is situated, and in such other streets or ways as are necessary or convenient to enable him to reach a highway. He acquires no easement in a street or way which his land does not touch, and which does not lead to a

highway; and he is not entitled to an injunction or other remedy by reason of an obstruction to such street or way.' '' State ex rel. Kincaid v. Hamilton, 109 Tenn. 283-284, 70 S. W. 621.

The doctrine announced in the case of State ex rel. Kincaid v. Hamilton has been adhered to in a very recent case decided by the Supreme Court, in which a judgment of this Court was affirmed, viz., McCord v. Hays, 202 Tenn. 46, 302 S. W. (2d) 331, decided in 1957. In that case, an alley in the town of Humboldt was ordered kept open for the use of the public, as well as for the individual benefit of complainant, an abutting owner. From the opinion of the Supreme Court, written by Mr. Chief Justice Neil, we quote as follows:

"As pointed out by the Court of Appeals, and not disputed, the deeds by former owners, recognized this alley as a property line, some of the deeds dating as far back as 1872. The same is confirmed by exhibits to the testimony of Jack C. Campbell, engineer and surveyor, and that of Mayor Foltz, who [is] admittedly a disinterested witness." McCord v. Hays, 202 Tenn. 54, 302 S. W. (2d) 334.

More specifically in point, however, on the facts of the instant case, is the opinion of the Supreme Court written by Mr. Justice Swiggart in Goetz v. Knoxville Power & Light Co., 154 Tenn. 545, 290 S. W. 409, 410. In that case the complainants were owners of lots or parcels of real estate adjoining the area known as the Fountain City Park. This park had been established by a land company, in connection with the lease and later sale of its property to the Knoxville Power & Light Company, said park being demised in the lease, as transferred to the Power

& Light Company "so long as said property may be used for park purposes by said party of the second part in connection with its line of railway extending from Knoxville to said property." The deed which conveyed the fee-simple title to the Power & Light Company contained a qualification to the covenant against encumbrances, as follows: "Except that free and unobstructed access to the spring on the north line of the property, first above described as being the spring tract of Fountain City Park, shall be given to Frank McBee, and to the public generally, such access, however, to be from the north side of the property hereby conveyed and at or near the spring site." Eleven days before the execution of the deed which conveyed fee-simple title to the Power & Light Company, the Fountain City company had conveyed to Frank McBee by warranty deed seven acres adjoining the park on which was located a hotel, which deed contained the following clause, "Also the right of access to adjoining park and use of spring on same." After the purchase of the hotel tract by McBee, he caused it to be subdivided into ten lots shown on a map, eight of which lots had been sold referring to the park as a southern boundary of each lot. The other two lots were sold by McBee to one Gillespie, who conveyed to Goetz, the complainant in the lawsuit. The deed to Goetz by his grantor contained a clause "in which he expressly conveyed to Goetz whatever rights, licenses, and privileges he held in the Fountain City Park, and to the spring and waters thereon." Subsequently, the Power & Light Company announced its purpose to subdivide the park property into building lots, streets and alleys, and to sell the same, and such sale had been advertised; whereupon, the bill was filed for a decree declaring the rights of the parties

in and to the park property and to enjoin the Power & Light Company from selling, transferring, encumbering or otherwise disposing of the property. It prayed that the property be declared to have been dedicated to the public use. Other lot owners joined in the suit and still other property owners and residents of Fountain City who owned no property in that vicinity intervened in the cause, claiming a dedication of the park for public use. The Chancellor denied any relief, but the Court of Appeals reversed as to the abutting lot owners, and held as to them that they were entitled to have the park kept open for their use and benefit. It denied the petition of the non-abutting lot owners and citizens of Fountain City, and no petition for certiorari as to that portion of the Court of Appeals' decree was filed. For that reason, the Supreme Court held that it could not pass on the claim of general dedication of the park to the public; but it sustained the contentions of the abutting lot owners and decided in their favor. From the opinion of the Supreme Court, we quote as follows:

"The lessor was given no right, by the terms of the lease, to insist that the Power & Light Company retain the property and maintain the park longer than it might desire to do so.

"This being true, we think that when the Knoxville Power & Light Company acquired the fee to the leased property, by the deed of Sept. 21, 1914, the lease was extinguished, and thereafter the Power & Light Company held the property solely under and by virtue of the deed executed to it by the Fountain City Company.

"If the complainants have any right of use or easement in the park property, it must be by virtue

of the clause in the deed executed by the Fountain City Company to Frank McBee, which was duly put of record before the execution of the deed from the Fountain City Company to the defendant; the language in the deed being a conveyance to McBee and his assigns, 'also the right of access to the adjoining park and the use of spring on same.'

\* \* \* \* \* \*

"Reference to the authorities available has disclosed that other jurisdictions make no distinction in principle between streets or avenues and parks or commons when it is sought to assert an easement in such street, avenue, park or common in favor of an abutting lot by reason of the fact that such lot was sold and conveyed with reference to a recorded map indicating that the lot sold fronts on such street or park.

"In Jones on Easements, section 436, the author says:

" 'In the same way a parcel of land designated on a plat as a park, public square, or common, with reference to which lots fronting upon it have been sold, is irrevocably dedicated to public use. There is no difference in the principle applicable to the dedication of public streets and [a] public square or park. In each case the dedication is to be considered with reference to the use to which the property may be applied or the purpose for which the dedication is made, and this may be ascertained by the designation which the owner gives to land upon the map or plat, whether it be a "street," "square" or "park." ' ".

"In the same work, at section 551, it is said:

" 'An encroachment upon a public park may be enjoined by a suit by an individual whose property is injured by the encroachment; as, for instance, the owner of a dwelling house and land fronting on a common or a public park can maintain a bill for an injunction against his neighbor who seeks to destroy the common by enclosing a large part of it for his own use; for the reason that the complainant's property is greatly enhanced in value by its situation, fronting the common, and would be greatly injured by the encroachment upon the common. He is not a mere volunteer, assuming to protect the rights of the public, but a party aggrieved who is seeking to protect his private interests.' " Goetz v. Knoxville Power & Light Co., 154 Tenn. 553, 555-556, 290 S. W. 411.

In another portion of the reported decision, Mr. Justice Swiggart, speaking for the Supreme Court, said:

"The affirmative language of the deed from the Fountain City Company to McBee, conveying to him the right of access to the adjoining park and the right to the use of the spring located thereon, *cannot have less force and effect than the mere reference to a recorded map showing the location of such park adjoining the property conveyed*. (Emphasis ours.) We hold therefore, that the deed to McBee created in his favor an easement in the park property, then recognized as such, and that if the property had been surrendered to the Fountain City Company by the Knoxville Power & Light Company, McBee could have compelled the Fountain City Company to retain

the property as an open space or park, and not to devote it to any use inconsistent therewith." Goetz v. Knoxville Power & Light Co., 154 Tenn. 559, 290 S. W. 413.

Also, from a later portion of the Supreme Court's opinion written by Mr. Justice Swiggart, we quote, as follows:

"It is contended for the [petitioner] that the easement contained in the words, 'right of access to the adjoining park,' covers nothing more than the right to pass through the park in order to reach the spring.

"We cannot agree with this contention. We think the language employed means that the owner of the hotel tract was given the right of entry into the park as a park, and that, by necessary implication, the right to the use and enjoyment of the park was included." Goetz v. Knoxville Power & Light Co., 154 Tenn. 563, 290 S. W. 414.

It thus appears that in Goetz v. Knoxville Power & Light Co., the rights of the lot owners adjoining the park in question, were sustained as an easement appurtenant to their holdings adjoining said park. Whether or not the Supreme Court would have sustained the rights of the general public of the town of Fountain City to use of the park, if that question had been properly before it, is immaterial.

In our opinion, the circumstance that the original plat filed by the Rugby Estates Land Company expressly dedicated the streets and alleys thereon shown for public use, but made no similar express dedication with reference to Tower Park, is immaterial. As shown in the authorities quoted above, the construction of the plat

in that situation must be taken most strongly against the landowner filing the plat. Also, the situation was considered and construed that way by Judge John W. McCall, who acquired title to the property here involved in 1936, and from whom all parties to this cause hold title deraigned from the common source. He was of opinion that he did not own Tower Park, and had no right to sell same; but, on the contrary, that the lot owners in the vicinity of same were entitled to have it maintained as and for a park. We feel compelled to place this same construction because of the well-settled principle of law that, where the parties themselves have placed a practical interpretation, no room is left for judicial construction. See Womble v. Walker, 181 Tenn. 246, 251, 181 S. W. (2d) 5; and State ex rel. College of Bishops of M. E. Church, South v. Vanderbilt University, 129 Tenn. 279, 164 S. W. 1151. From the testimony of Judge McCall, we quote as follows:

"Q. When you sold lots from this Exhibit (indicating Plat), did you sell the purchasers this Tower Park? A. Yes, it was generally known—I didn't personally sell the lots, a realtor sold the lots—it was generally known that the common knowledge has been there was these two park areas.

"Q. What was the Tower park for? What was the purpose of it? A. Just a little public park there for general purposes; I don't want to state something I don't know; I think you can prove the facts that the water line was through there but I may be wrong; the records will show it.

"Q. Was the Tower Park a part of the land that was to be sold for private use? A. I did not so consider it and did not put it on sale.

"Q. Now, on any occasion did any of those who purchased lots ask you if you would sell this Tower Park? A. Yes, ultimately.

"Q. Do you remember selling to Mr. Russ? A. Who?

"Q. Mr. Russ. A. Yes.

"Q. Did he ask you—A. I don't recall.

"Q. You don't recall? Did you ever offer to make a quit claim deed to any of them if they wanted it? A. No sir.

"Q. I see; when you were selling these lots, in what way was this little Tower Park area being used? A. Just as a little public spot or playground as you have them, don't you know?

"Q. Was that the purpose of its being left there? A. Well, that was before my time; I certainly assume it was or it wouldn't have been set up that way.

"Q. When you got it you treated it that way? A. I treated it as a public park.

"Q. And sold your lots on that basis? A. Yes.

"Q. Do you claim ownership on that Tower Park as a beneficial owner? A. Frankly, I didn't think I owned it and never claimed it.

"Q. When you made this quit claim deed in the records to Mr. Collier and Mr. Fracchia, did they know that? A. Certainly did or I would have given them a warranty deed to it; I made it clear I didn't claim to own it and I wouldn't give anything but a quit claim deed.

"Q. You made it clear that you didn't claim to own it and would give nothing but a quit claim deed? A. Yes.

"Q. Had you in any way been in possession using it for your own purposes in any at all since you had it? A. I had not.

"Q. Were you at the time you made this quit claim deed? A. I was not."

In the instant case, both aspects of the situation are properly presented, i. e., complainants are entitled to relief both as abutting lot owners and also as representing the general public. We hold that complainants, both on behalf of themselves as owners lot adjoining Tower Park and also on behalf of other lot owners and residents of the Rugby Subdivision, as members of the general public, are entitled to a decree adjudging that Tower Park has been generally dedicated to the public for park purposes; and also that they, as adjoining land owners, are entitled to an easement therein for that purpose. The decree of the Chancellor will be reversed, and a decree entered in this Court granting to complainants cancellation of the deeds from both Ben F. James and John W. McCall, Trustee, to defendants Collier and Fracchia, and granting an injunction as prayed for in the Original Bill, after which this cause will be remanded to the Chancery Court of Shelby County, Tennessee, for supervision and enforcement of the decree to be thus entered in this Court.

The costs of the cause, including those of the lower court as well as those of the appeal, will be adjudged against the defendants, L. K. Collier and P. F. Fracchia.

Avery, P. J. (W.S.), and Carney, J., concur.